**BAYVIEW HUNTERS POINT COMMUNITY ADVOCATES, et al., Plaintiffs,**

v.

**METROPOLITAN TRANSPORTATION COMMISSION, et al., Defendants.**

**No. C01–0750 TEH.**

United States District Court, N.D. California.

Nov. 9, 2001.

Deborah S. Reames, Bruce Edward Nilles, Earthjustice Legal Defense Fund, San Francisco, CA, for Bayview Hunters Point Community Advocates, Communities for a Better Environment, Latino Issues Forum, Our Children's Earth, Sierra Club, Transportation Solutions Defense and Education Fund, Urban Habitat Program, and The Tide Center.

Alan Ramo, Environmental Law and Justice Clinic, Helen H. Kang, Golden Gate University School of Law, San Francisco, CA, for Communities for a Better Environment, and Our Children's Earth Foundation.

Richard T. Drury, Communities for a Better Communities, Oakland, CA, for Communities for a Better Environment.

Marc Chytilo, Santa Barbara, CA, for Transportation Solutions Defense and Education Fund.

David D. Cooke, Allen Matkins Leck, Gamble & Mallory LLP, San Francisco, CA, Francis F. Chin, Metropolitan Transportation Commission, Joseph P. Bort MetroCenter, Oakland, CA, for Metropolitan Transportation Commission.

Donald P. Margolis, City Attorney's Office, City and County of San Francisco, San Francisco, CA, for San Francisco Municipal Railway.

## ORDER

THELTON E. HENDERSON, District Judge.

These matters came before the Court on Tuesday, November 6, 2001, on the parties' cross-motions for summary judgment under Federal Rule of Civil Procedure 56. After careful consideration of the parties' written and oral arguments, this Court GRANTS IN PART and DENIES IN PART each of the parties' motions as described in the discussion below.

### FACTUAL BACKGROUND

This suit arises out of the federal Clean Air Act ("CAA"), 42 U.S.C. §§ 7401–7671q (2001), the history of which has been well-documented elsewhere. *See, e.g., Citizens for a Better Env't v. Deukmejian,* 731 F.Supp. 1448, 1451–52 (N.D.Cal.1990) [hereinafter *"CBE I"*]. As part of the CAA, states are required to develop, and submit to the Environmental Protection Agency ("EPA") for approval, a state implementation plan ("SIP") for achieving and maintaining National Ambient Air Quality Standards ("NAAQS"). At issue in this case is the portion of the California SIP applicable to the San Francisco Bay Area, which remains a non-attainment area for the ozone NAAQS thirty years after that standard was first promulgated. *See, e.g.,* Approval and Promulgation of Ozone Attainment Plan and Finding of Failure to Attain; San Francisco Bay Area, 66 Fed.

Reg. 17,379, 17,385 (proposed Mar. 30, 2001) (documenting the Bay Area's failure to attain the ozone NAAQS for the period 1998–2000). Specifically, Plaintiffs in this suit challenge the implementation status of Transportation Control Measure 2 ("TCM 2"), a measure set forth in the 1982 Bay Area Air Quality Plan ("1982 Plan").[1] The remaining Defendants in this case are the Metropolitan Transportation Commission ("MTC") and San Francisco Municipal Railway ("MUNI").[2]

Although first submitted in 1982 and approved by the EPA in 1984, TCM 2 remains as part of the SIP. TCM 2 is defined as follows: "*Support post–1983 improvements identified in transit operator's* [sic] *5–year plans, [and] after consultation with the operators adopt ridership increase target for 1983–1987.*" 1982 Plan at B–3 (Ex. A to Def. MTC's Opening Mem.). The 1982 Plan also lists emission reduction estimates "predicated on a 15% ridership increase. The actual target would be determined after consultation with the transit operators." *Id.* Ridership increases were expected to come from "productivity improvements," rather than a significant growth in the size of the transit system. *Id.* In order to achieve the goals of TCM 2, the Plan set forth the following four-part implementation schedule:

- 6 major transit operators[3] adopt FY 1983–87 plans by July, 1982.
- MTC consults with operators on ridership targets by Jan., 1983.

- MTC, through implementation of the TIP [Transportation Improvements Plan] and allocation of regional funds, seeks to ensure operators' 5–year plans are implemented.
- Ridership gains are monitored through annual RFP [Reasonable Further Progress] reports.

*Id.* Finally, the 1982 Plan describes TCM 2 as "basically an extension of TCM # 1," *id.*, which requires "reaffirm[ation of a] commitment to 28% transit ridership increase between 1978 and 1983," *id.* at B–2.

The primary dispute in this case is whether TCM 2 requires, as Plaintiffs contend, that MTC, MUNI, and the other regional transit operators achieve a 15% regional transit ridership increase over 1982–83 levels. Defendants argue that TCM 2 only requires them to complete the four steps enumerated in the implementation schedule. Because the interpretation of TCM 2 is a legal question, the parties agree that this case is appropriate for adjudication on summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute as to material facts and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Toscano v. Prof'l Golfers Ass'n*, 258 F.3d 978, 982 (9th Cir.2001). Material facts are those which may affect the outcome of the case. *Anderson v.*

---

1. Two of the current Plaintiffs, Communities for a Better Environment (then Citizens for a Better Environment) and the Sierra Club, brought suit before this Court in 1989 for alleged violations of different provisions of the 1982 Plan. *See, e.g., CBE I*, 731 F.Supp. 1448; *Citizens for a Better Env't v. Deukmejian*, 746 F.Supp. 976 (N.D.Cal.1990) [hereinafter "*CBE II* "]; *Citizens for a Better Env't v. Wilson*, 775 F.Supp. 1291 (N.D.Cal.1991) [hereinafter "*CBE III* "].

2. Plaintiffs also named the Alameda–Contra Costa Transit District ("AC Transit") as a Defendant. However, Plaintiffs and AC Transit entered into a consent decree that represented "full and final settlement of the allegations in the Complaint against AC Transit." Apr. 12, 2001 Consent Decree.

3. The six operators are: MUNI, AC Transit, Bay Area Rapid Transit ("BART"), Golden Gate Transit, San Mateo County Transit ("SamTrans"), and the Santa Clara Valley Transportation Authority ("VTA").

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court may not weigh the evidence and must view the evidence in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. 2505.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.* at 322–323, 106 S.Ct. 2548. However, on an issue for which its opponent will have the burden of proof at trial, the moving party can prevail merely by "pointing out to the District Court ... that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. If the moving party meets its initial burden, the opposing party must then "set forth specific facts showing that there is a genuine issue for trial" in order to defeat the motion. Fed. R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250, 106 S.Ct. 2505.

## DISCUSSION

At issue in this suit are Defendants' obligations under TCM 2. Before discussing the substance of those obligations, this Court must first address the jurisdictional matters raised by the parties.

### I. *Article III Standing*

 Three criteria must be satisfied before an organization has standing under Article III to bring suit on behalf of its members. First, the organization's members must have standing to sue individually. Second, the organization must be seeking to protect interests that are germane to its purpose. Finally, neither the claim asserted nor the relief requested must require direct participation of the organization's members in the lawsuit. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977).

Here, Plaintiffs have sufficiently demonstrated that the interests advanced in this lawsuit fall within the mission of each Plaintiff organization. *See* Pls.' Opening Mem. at 11 (and declarations cited therein). Moreover, this Court agrees with Plaintiffs that the direct participation of individual members is unnecessary. Thus, the Court concludes, and Defendants do not dispute, that Plaintiffs have satisfied the second two prongs of organizational standing.

 Defendant MTC argues, however, that Plaintiffs lack standing because they are unable to satisfy the first requisite of organizational standing, that Plaintiffs' members would have standing to sue individually. In order to satisfy the standing requirements of Article III, an individual must show:

(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 180–81, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). MTC argues that Plaintiffs fail to meet this standard because the alleged injuries are not "fairly traceable" to Defen-

dants' actions and because a favorable decision would not be likely to redress the injuries.

This Court is not so persuaded, and it finds that individual members of Plaintiffs' organizations would have standing to sue for the following reasons. First, it is beyond dispute, that Plaintiffs' members have alleged injuries that satisfy the "injury in fact" requirements.[4] Plaintiffs claim a variety of injuries, including adverse health effects, aesthetic injuries, and economic harm. *See* Pls.' Opening Mem. at 11–12 (and declarations cited therein). These alleged injuries are more than sufficient to satisfy the first requirement for individual standing. *See, e.g., Friends of the Earth*, 528 U.S. at 183, 120 S.Ct. 693 (recreational, aesthetic, and economic injuries are sufficient to confer standing); *Natural Res. Def. Council, Inc. v. United States Envtl. Prot. Agency*, 507 F.2d 905, 910 (9th Cir.1974) (being "compelled to breathe air less pure than that mandated by the Clean Air Act" is sufficient).

■ In addition, the injuries are fairly traceable to the challenged actions of Defendants. MTC cites the SIP itself to support its contention that TCMs have "virtually no impact" on ozone because they reduce hydrocarbons and nitrogen oxides ($NO_x$) simultaneously. 1982 Plan at 102. Plaintiffs cite contrary evidence that $NO_x$ reductions lead to reduced ozone levels. Pls.' Reply at 4–5 (and citations therein). While the precise impact of TCM 2 on ozone levels is a disputed question of fact that this Court cannot decide on motions for summary judgment, the facts indicate that TCM 2 has at least some, although perhaps minimal, impact on reducing ozone.[5] Although perhaps not as compelling an injury as could be imagined, this slight impact is sufficient to satisfy traceability. *See United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 690 n. 14, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (refusing to adopt the government's argument that standing should be limited to those who have been "significantly" affected by agency action, instead holding that any "direct stake," including a "trifle," is enough to establish standing). Moreover, even if Plaintiffs could not show the required nexus between TCM 2 and reduction in ozone levels, it is undisputed that TCM 2, through reductions in $NO_x$, would reduce haze and smog. *See, e.g.,* Regional Haze Regulations, 64 Fed.Reg. 35,714, 35,-715 (July 1, 1999). Thus, traceability is clearly met for Plaintiffs' alleged aesthetic and economic injuries resulting from elevated levels of smog.

■ Finally, it is more than likely that a favorable decision for Plaintiffs will redress their alleged injuries, thereby satisfying the third requirement for individual standing. Plaintiffs here seek injunctive relief to mandate that Defendants implement TCM 2.[6] As discussed above, Plaintiffs' alleged injuries are fairly traceable to Defendants' alleged failure to implement TCM 2. Thus, it goes without question that the injunctive relief sought by Plaintiffs would alleviate the alleged injuries. Even though Plaintiffs' injuries might not be completely eliminated by the implementation of TCM 2, any increase in air quality that would result from a favorable decision,

---

**4.** Defendants do not seriously contest this first prong of individual standing, but it is nevertheless important to discuss since this Court would lack jurisdiction if Plaintiffs failed to establish standing.

**5.** The authorities Defendants offer indicate only that TCMs may not have a significant impact on ozone reduction, not that they will have no impact whatsoever.

**6.** Plaintiffs also seek civil penalties against Defendants, but they reserve that matter for later adjudication or settlement. Pls.' Opening Mem. at 23 n.19.

is sufficient to satisfy the "minimal requirements of Article III." *Pub. Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 73 (3d Cir.1990) (holding that, to have standing, plaintiffs must only show that the injunctive relief requested would "decrease" pollution, not that it would return a polluted waterway to "pristine condition").

In short, individual members of Plaintiffs' organizations satisfy the three requirements for Article III standing. Because Plaintiffs have also satisfied the other requirements for organizational standing, this Court rejects Defendant MTC's argument that this suit must be dismissed for lack of constitutional standing.

## II. *Statutory Standing Under 42 U.S.C. § 7604*

Both Defendants also argue that the Court must dismiss this suit because Plaintiffs have no statutory standing to sue. Plaintiffs assert that they may properly sue under the CAA's citizen suit provision, which allows private suits "against any person ... who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of ... an emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1).[7] That is, citizen suits may be brought for alleged "continuous or intermittent" violations but not for alleged violations that are "wholly past." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.,* 484 U.S. 49, 57, 108 S.Ct.

376, 98 L.Ed.2d 306 (1987) (interpreting "to be in violation" under the Clean Water Act); *San Francisco Baykeeper, Inc. v. Moore,* No. CIV. S–00–0334 WBS/DAD, 2001 U.S. Dist. LEXIS 2980, at *12 (E.D.Cal. Jan. 19, 2001) (applying *Gwaltney* to the Clean Air Act's "to be in violation" requirement).

Defendants contend that the citizen suit provision does not apply here because Plaintiffs allege only "wholly past" violations. They assert that whatever obligations they had under TCM 2 had to be completed by 1987, at the latest, and are incapable of being repeated. Thus, Defendants argue, Plaintiffs' allegations that Defendants violated TCM 2 are inappropriate subjects for a citizen suit under the CAA.

In support of their claims, Defendants cite two CAA cases: *United States v. Trident Seafoods Corporation,* 60 F.3d 556 (9th Cir.1995), and *City of Yakima v. Surface Transportation Board,* 46 F.Supp.2d 1092 (E.D.Wash.1999).[8] In *Trident Seafoods,* the Ninth Circuit held in a 2–1 opinion that a defendant could not be held liable for penalties based on a continuing violation theory when it failed to notify the EPA of asbestos removal before beginning a building renovation. *Trident Seafoods,* 60 F.3d at 558–59 (citing 42 U.S.C. § 7412 (1988); 40 C.F.R. Part 61, Subpart M (1988) (provisions requiring such notice under the CAA)). Instead, the court held that the provision could only be violated on a single day—the day before renovation began. *Id.* at 558. After renovation began, the court reasoned, the defendant was under no obligation to notify the EPA

---

7. The citizen suit provision also contains a number of restrictions on allowable suits, such as Eleventh Amendment sovereign immunity and notice requirements. *See* 42 U.S.C. § 7604(a)-(b). However, none of these exceptions is applicable to the instant case.

8. Defendants also cite two other district court cases in support of this proposition. *See City*

*of Toledo v. Beazer Materials & Servs., Inc.,* 833 F.Supp. 646 (N.D.Ohio 1993); *Harris Bank Hinsdale, N.A. v. Suburban Lawn, Inc.,* 1992 WL 396295 (N.D.Ill.Dec.22, 1992). These cases are inapposite, however, because they do not concern the citizen suit provision under the Clean Air Act. *Id.*

because the "clear language of the regulation" stated that notification had to occur before renovation. *Id.* Because the EPA chose not to "state clearly in its regulations either that there is a continuous duty to notify or that failure to notify gives rise to a penalty based on the length of time that the breach exists," the court would not read such language into the regulation at issue. *Id.* at 558–59.

The district court in *Yakima* cited *Trident Seafoods* as "appear[ing] to support defendants' assertion that failure to perform a conformity determination [under the CAA, 42 U.S.C. § 7506] would constitute only a single completed violation." *Yakima,* 46 F.Supp.2d at 1099. This was one of several independent reasons the court cited for rejecting jurisdiction. The court also found jurisdiction lacking because the Hobbs Act applied, giving exclusive jurisdiction to the courts of appeal, *id.* at 1095–98; because the conformity provision was not an "emission standard or limitation" as defined in 42 U.S.C. § 7604, in part because it was enacted by Congress and was not part of a permit or SIP, *id.* at 1098–99; and because the EPA's duty to investigate or require compliance with the conformity provision is discretionary, *id.* at 1099–1100.

Both of these cases are distinct from the instant case, and Defendants' reliance on them is misplaced. First, in addition to being dicta from a non-controlling opinion, the *Yakima* court's decision is distinguishable because of the differences in the alleged violations. The *Yakima* plaintiffs alleged violation of a conformity provision enacted by Congress, not a transportation control measure adopted as part of a SIP. Unlike the conformity provision, transportation control measures are clearly includ-

ed under the CAA's definition of "emission standard or limitation." *See* 42 U.S.C. § 7604(f)(3) (including under the definition "any condition or requirement under an applicable implementation plan relating to transportation control measures"). Beyond that, unlike the EPA's duty to act under the conformity provisions, compliance with a SIP is not discretionary. *CBE I,* 731 F.Supp. at 1458.

■ Moreover, in contrast to the City of Yakima, Plaintiffs in this case can point to multiple authorities to support their allegation of jurisdiction. *See Yakima,* 46 F.Supp.2d at 1099 ("The City cites no authority in support of this allegation [that the violation is ongoing].") For example, as this Court has previously observed with respect to the same SIP at issue in this case,

> Congress was clear that SIPs remain in force until a new SIP is approved regardless of whether the statutory deadline has passed.... Indeed, the 1982 Plan contains many provisions whereby certain events or commitments were to occur or be satisfied by certain dates. However, the fact that those dates passed without compliance, or that the 1987 statutory deadline expired, did not automatically parse those provisions from the 1982 Plan. On the contrary, to the extent such provisions concerned enforceable components, the courts have routinely enforced, and are in fact obligated to enforce, such provision[s], despite the passage of governing deadlines.

*CBE III,* 775 F.Supp. at 1297. That is, states are obligated to comply with all provisions of a SIP until such provisions are removed—not, as Defendants contend, only until the scheduled implementation deadlines have passed.[9] Furthermore, it is

---

9. Logic also supports this result. Simply because a deadline has passed does not mean that a party is no longer liable. Plaintiffs' analogy to paying taxes illustrates this point

well: Just because someone does not pay his or her taxes by April 15 does not mean that he or she is relieved of any obligation to pay.

axiomatic that a state that is not in compliance is "in violation of" the SIP. Thus, several courts—including this one—have found jurisdiction over citizen suits brought for SIP violations that occurred after scheduled implementation deadlines passed. *See id.*; *Am. Lung Ass'n of New Jersey v. Kean*, 670 F.Supp. 1285 (D.N.J. 1987), *aff'd*, 871 F.2d 319 (3d Cir.1989); *Natural Res. Def. Council, Inc. v. New York State Dep't of Envtl. Conservation*, 668 F.Supp. 848 (S.D.N.Y.1987). Also, the EPA has issued guidance specifically stating that implementation of transportation control measures must continue permanently until they are either substituted or removed from the SIP.[10] Approval and Promulgation of Ozone Attainment Plan and Finding of Failure to Attain; San Francisco Bay Area, 66 Fed.Reg. at 17,-383; Transportation Conformity Amendment: Deletion of Grace Period, 64 Fed. Reg. at 66,834–35. All of these authorities support Plaintiffs' claim that this Court has jurisdiction over this suit even though the scheduled implementation deadlines under TCM 2 have passed.

These authorities also help to distinguish the present case from *Trident Seafoods*. In that case, the Ninth Circuit based its conclusion in part on a finding that the EPA failed to state clearly that the notification duty was continuous. Here, by contrast, it is clear that SIP compliance *must* be continuous. *See, e.g.*, *CBE III*, 775 F.Supp. at 1296 ("Once EPA approves a SIP, the state is required to comply with it unless and until a new, revised SIP is formally approved and takes its place. Absent such a formal revision,

states are 'relegated to a lone option: compliance [with the existing SIP].'" (citation omitted) (alteration in original)).

Defendants appear to understand that they must comply with the SIP. However, they attempt to avoid their obligations to comply with TCM 2 by arguing that TCM 2 only remains in the SIP for accounting purposes. However, even if that were true—and this Court need not make a finding one way or the other—it would be irrelevant. MTC requested removal of TCM 2 from the SIP, but EPA refused that request. Tobey Decl. ¶¶ 11–13 (Ex. Q to Pls.' Opp'n). As a result, TCM 2 remains as part of the SIP, which means that Defendants continue to be required to comply with it. *See* Approval and Promulgation of Ozone Attainment Plan and Finding of Failure to Attain; San Francisco Bay Area, 66 Fed.Reg. at 17,383 (describing EPA's proposed approval of the deletion of four TCMs, not including TCM 2, from the SIP). Because TCM 2 qualifies as an "emission standard or limitation," Plaintiffs' allegations that Defendants are in violation of this control measure are sufficient to confer jurisdiction on this Court under 42 U.S.C. § 7604, the citizen suit provision of the CAA.

### III. *Preclusion*

Defendant MTC next argues that res judicata or, alternatively, collateral estoppel bars the Court's consideration of the present suit.

#### A. *Res Judicata*

 Res judicata bars a party from bringing a claim if (1) a court of competent

---

Indeed, this Court finds incomprehensible Defendants' suggestion that a party could avoid liability for something it is obligated to do simply by doing nothing and waiting for the deadline to pass.

**10.** The guidance contains an exception for approved SIPs that "specifically stipulate that

implementation will cease at a specific time." Transportation Conformity Amendment: Deletion of Grace Period, 64 Fed.Reg. 66,832, 66,834–35 (proposed Nov. 30, 1999). However, that exception is inapplicable here because neither the SIP nor the TCM contains such a stipulation.

jurisdiction (2) rendered a final judgment on the merits (3) on the same claim (4) in a prior action between the same parties or their representatives. *In re Int'l Nutronics, Inc.,* 28 F.3d 965, 969 (9th Cir.1994). The doctrine bars all grounds for recovery that could have been asserted, regardless of whether they actually were asserted, during the prior action. *Id.*

Defendant MTC argues that the present suit is barred by res judicata because of this Court's final judgment in the Sierra Club/CBE litigation. *See Citizens for a Better Env't v. Wilson,* No. C89–2044 TEH, Judgment (N.D.Cal. Aug. 27, 1992). The Court was a court of competent jurisdiction, thereby satisfying the first res judicata requirement. *CBE I,* 731 F.Supp. at 1454–58 (holding that the Court had jurisdiction to hear the suit under the citizen suit provision of the CAA). Even though it was entered into by stipulation of the parties, the judgment also satisfies the second res judicata requirement as a judgment on the merits. *See Int'l Union of Operating Engineers–Employers Const. Industry Pension, Welfare & Training Trust Funds v. Karr,* 994 F.2d 1426, 1429 (9th Cir.1993) (dismissal of action with prejudice pursuant to a settlement agreement is a final judgment on the merits and thus has preclusive effect barring subsequent actions on the same claim).

The main dispute in this case relates to the third res judicata requirement: that the earlier action be based on the "same claim" as the present suit.[11] First, Plaintiffs argue that the present suit is based on Defendants' alleged noncompliance with TCM 2 in 2001, which cannot be considered the same claim because it could not

possibly have been brought with the earlier case in 1989. *See Lawlor v. Nat'l Screen Serv. Corp.,* 349 U.S. 322, 328, 75 S.Ct. 865, 99 L.Ed. 1122 (1955) ("While the 1943 judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."). Defendant MTC counters by asserting that *Lawlor* is inapplicable because Plaintiffs' current position depends solely on evidence that was available at the time of the earlier action. For support, MTC relies on two cases from other circuits: *Supporters to Oppose Pollution, Inc. v. Heritage Group,* 973 F.2d 1320 (7th Cir.1992) [hereinafter *"StOP"*], and *Rose v. Town of Harwich,* 778 F.2d 77 (1st Cir.1985).

This Court finds neither case to be controlling. In *Rose,* the plaintiff lost his suit in state court alleging an unlawful taking and then attempted to recover for the same alleged unlawful taking in federal court. *Rose,* 778 F.2d at 78. The court found that the "continuing trespass" doctrine did not apply because the plaintiff gave the court "no reason to believe that the legality of the town's actions depends on anything that has happened since the state court dismissed his original suit." *Id.* at 82. In *StOP,* the plaintiffs attempted to bring a successive federal suit against a privy of the party sued in the first case based on exactly the same claim, that defendants had an obligation to pay for an environmental cleanup following closure of a landfill. *StOP,* 973 F.2d at 1322. The plaintiffs contended that the ongoing release of hazardous material into the

---

**11.** With respect to the fourth res judicata requirement, Defendants claim—and Plaintiffs do not dispute—that it is irrelevant that some of the current Plaintiffs were not parties to the previous action. Defendants argue that Plaintiffs' interests are sufficiently aligned with the interests of the plaintiffs in the earlier suit that the "same parties" requirement under res judicata is satisfied. This Court need not decide that question since it finds that the two actions are not based on the same claim.

groundwater led to a "new wrong" and therefore a different claim. *Id.* at 1326. The court concluded, however, that plaintiffs only presented evidence of "new injury" and not of "new wrong," and therefore res judicata applied. *Id.* ("Additional knowledge about the loss from a tort does not authorize new suits.").

In this case, by contrast, Plaintiffs' allegations relate to a "new wrong" and not simply a "new injury." A state is obligated to comply *continuously* with the provisions of a SIP until removal or revision of those provisions is approved by the EPA. *See supra* at 9–11. Thus, every day of violation constitutes a new violation of the law—i.e., a new wrong—and not just a compounding of injuries caused by earlier violations. This Court finds the Supreme Court's analysis in *Lawlor* to be persuasive. Just as the public has a strong interest in the "vigilant enforcement" of antitrust laws, it also has a strong interest in the vigilant enforcement of the Clean Air Act. *See Lawlor*, 349 U.S. at 329, 75 S.Ct. 865 (antitrust laws); *CBE I*, 731 F.Supp. at 1454(CAA). As the Supreme Court noted, "Acceptance of the respondents' novel contention [that a prior judgment should bar subsequent claims] would in effect confer on them a partial immunity from civil liability for future violations. Such a result is consistent with neither the antitrust laws [or Clean Air Act] nor the doctrine of res judicata." [12] *Lawlor*, 349 U.S. at 329, 75 S.Ct. 865.

Moreover, the Ninth Circuit has developed a four-part test for deter-mining what constitutes the same claim for purposes of res judicata analysis, and Defendant MTC fails to convince the Court that that test is satisfied here. In order to determine whether successive lawsuits involve a single claim, courts must consider four factors:

> (1) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (2) whether substantially the same evidence is presented in the two actions; (3) whether the two suits involve infringement of the same right; and (4) whether the two suits arise out of the same transactional nucleus of facts.

*Costantini v. Trans World Airlines*, 681 F.2d 1199, 1201–02 (9th Cir.1982). Of these factors, the last is the most important. *Id.* at 1202.

Despite MTC's assertions to the contrary, the present action does not "arise out of the same transactional nucleus of facts" as the 1989 litigation and therefore cannot be considered to arise out of the same claim. Certainly, as all parties recognize, the two actions are related; but such relation is insufficient to invoke the preclusive effects of res judicata. The 1989 litigation focused on MTC's obligation to implement contingency TCMs, while the present litigation involves only TCM 2, a non-contingency TCM. Thus, the suits are premised on two different, albeit related, provisions of the SIP. More importantly, the two actions depend on divergent sets of facts. Plaintiffs in the 1989 litigation

---

**12.** MTC raises a valid concern that failure to apply preclusive principles risks "needless relitigation of settled claims." Def. MTC's Reply at 11–12. However, MTC's conclusion that res judicata must apply to avoid the possibility of Plaintiffs' "render[ing] the Court's judgment a nullity by returning annually to assert a 'continuing violation' of TCM 2 on the exact same theory" is flawed. *Id.* Plaintiffs *would* be barred from doing what MTC fears, but not on res judicata grounds. Rather, collateral estoppel would apply to bar re-litigation by the same parties of the same issues even where, as in this hypothetical, the subsequent action raised a new claim. *See infra* at 15–16 (discussing the requirements for collateral estoppel).

had to show, and did show, that reasonable further progress (RFP) had not been made with respect to ozone or carbon monoxide in the Bay Area and that MTC failed to implement a transportation contingency plan as required by the SIP. *See CBE III,* 775 F.Supp. at 1293 (discussing the background of the 1989 case). At no point during the 1989 litigation did Plaintiffs need to demonstrate that Defendants failed to implement TCM 2, or indeed that Defendants failed to implement any of the original TCMs in the SIP. All that mattered was that Defendants failed to achieve RFP. It was irrelevant to the earlier action, for example, whether Defendants achieved a 15% increase in regional transit ridership, adopted five-year plans, or allocated sufficient funding to ensure the implementation of the five-year plans. While the specific obligations imposed by TCM 2 will be discussed later in this Order, these are the types of facts that are relevant to resolving the present dispute. Consequently, this Court concludes that the 1989 litigation and the current dispute are founded upon different nuclei of facts. The above discussion also demonstrates that the two cases involve infringement of different rights and require different types of evidence for resolution. As a result, the cases are not based on the same claim, and res judicata therefore does not bar the present action.

### B. *Collateral Estoppel*

▆▆▆▆ MTC also contends that the current suit is barred under the doctrine of collateral estoppel. Collateral estoppel bars relitigation of an issue if (1) the identical issue (2) was actually litigated in a prior action and (3) the determination of the issue in the prior action was "a critical

and necessary part of the judgment." *Clark v. Bear Stearns & Co.,* 966 F.2d 1318, 1320 (9th Cir.1992).

The doctrine does not apply to bar Plaintiffs' current suit because Defendants' implementation of TCM 2 was neither actually litigated nor a necessary part of the earlier judgment. First, nothing in the record demonstrates that the parties in the 1989 action "actually litigated" the issue of whether Defendants had implemented TCM 2. MTC relies heavily on a single statement from one of the Court's orders to support its position. *See Citizens for a Better Env't v. Deukmejian,* No. C89–2044 TEH, Order at 24 (N.D.Cal. Mar. 11, 1991) ("The TCMs identified in the 1982 Plan have already been implemented."). However, the Court is not persuaded that this single statement—out of hundreds of pages of orders in that case—indicates that the issue was actually litigated.[13] To the contrary, the Court, which is obviously familiar with the 1989 litigation since it presided over the proceedings, finds that the implementation status of TCM 2 was not actually litigated at that time.

▆▆▆ Moreover, even if the issue had been actually litigated, its resolution was not necessary to the judgment. Finding that RFP was not being met with respect to ozone and carbon monoxide only required finding that the emission reductions that the original TCMs were to have realized had not been achieved; it did not require finding that TCM 2 had not been implemented. Similarly, the implementation status of TCM 2 was irrelevant to the Court's approval of MTC's conformity assessment procedures. MTC itself has emphasized the lack of relevance between

---

**13.** Furthermore, MTC's contention that it fully implemented TCM 2 by 1991 contradicts its own documents. *See, e.g.,* 1990–94 Transportation Improvement Program Air Quality Conformity Assessment at II–10–9 (Ex. N–1 to Pls.' Opening Mem.) (stating that implementation was completed for TCM 1, but describing "Further Steps MTC Can Take to Fully Implement TCM 2").

these two issues. *See* Pls.' Opp'n at 16 (citing MTC's Feb. 6, 1991 Reply Mem.). Consequently, determining whether Defendants implemented TCM 2 was not necessary to either aspect of the 1989 litigation, and collateral estoppel therefore does not bar the present action.

## IV. *The Requirements of TCM 2*

■ Having determined that Plaintiffs have standing to bring this suit, and that neither res judicata nor collateral estoppel bars consideration of the present claims, this Court now moves on to the substantive allegations at issue—i.e., what TCM 2 requires Defendants to do. The primary dispute in this case concerns whether TCM 2 requires a 15% increase in regional transit ridership over 1982–83 levels. Plaintiffs' entire case is premised on their conclusion that such an increase is required. Defendants, by contrast, assert that the only enforceable strategies in TCM 2 are the four parts of the implementation schedule; the ridership increase, they argue, is an unenforceable goal. For the reasons set forth below, this Court agrees with Plaintiffs and finds that it has the authority to enforce both the implementation strategies and the 15% ridership increase.

■ Defendants correctly observe that courts may only enforce specific strategies of a SIP and may not enforce the SIP's overall goals or the NAAQS directly. *See, e.g., CBE I,* 731 F.Supp. at 1454. However, the Court disagrees with Defendants that the 15% ridership increase constitutes one of the SIP's overall goals rather than a

specific strategy.[14] That TCM 2 specifies four concrete steps towards achieving the ridership increase—and that these steps are indisputably specific strategies that the Court has the power to enforce—does not undermine this conclusion. It is possible, after all, to have more than one level of enforceable specific strategies underlying an overall goal. Furthermore, as MTC itself argues, "Reducing emissions, not increasing transit ridership, was the ultimate objective [i.e., the overall goal] of the 1982 Plan." Def. MTC's Opp'n at 14.[15] Thus, while the Court could not enforce the emissions reductions estimated to stem from TCM 2, it does have the power to enforce the implementation of TCM 2 itself.

Such implementation requires both completion of the four-step "implementation schedule" listed in the Plan—as is clear from the language of TCM 2, and which Defendants do not contest—as well as a 15% increase in regional transit ridership. The Court agrees with Defendants that TCM 2 does not, on its face, require a ridership increase of 15%. However, TCM 2 states in clear language that MTC must, in consultation with the six major transit operators in this region, "adopt a ridership increase target for 1983–87." 1982 Plan at B–3. Substantial evidence indicates that MTC adopted the 15% estimate as the actual target. *See, e.g.,* 1994 Regional Transportation Plan for the San Francisco Bay Area at C–15 (Ex. O–1 to Pls.' Opening Mem.) (stating that, "a 15 percent increase in transit ridership was adopted as

14. This case is distinguishable from the two Second Circuit cases cited by MTC. *See Action for Rational Transit v. W. Side Highway Project,* 699 F.2d 614 (2d Cir.1983); *Council of Commuter Orgs. v. Metro. Transp. Auth.,* 683 F.2d 663 (2d Cir.1982). Unlike plaintiffs in those cases, Plaintiffs here have pointed to specific strategies contained in the SIP and have not simply alleged amorphous violation

of overall goals. Indeed, it is difficult to imagine anything that could be more specific than an identified numerical target measuring a change in a single variable.

15. MTC also heavily emphasized this point at oral argument, thus undermining its position that a transit ridership increase was TCM 2's unenforceable overall goal.

the target for this time period," when listing the implementation status of TCM 2); Bay Area Air Quality 1987 RFP Report at 44 (Ex. M–2 to Pls.' Opening Mem.) (stating that TCM 2 "is to increase transit ridership by 15% between 82/83 and 87/88 to achieve a commensurate emission reduction"). Defendants cite no contrary evidence, and so it is appropriate for the Court to conclude that no rational trier of fact could find that Defendants did not adopt 15% as the actual target. As a result, this is a matter that can be appropriately decided at the summary judgment stage.

Defendants vigorously argue that TCM 2 only requires the adoption of a target increase, not the actual achievement of that increase. However, the Court finds such arguments to be disingenuous. MTC's own documents imply that TCM 2 requires actual achievement of the increase. *See, e.g.,* 1997 Transportation Improvement Program Air Conformity Analysis at 5–6 (Ex. N–2 to Pls.' Opening Mem.) (when describing the implementation status of TCM 2, focusing solely on the Bay Area's failure to attain a 15% ridership increase and noting several further steps MTC could take to implement TCM 2 fully); 1990–94 Transportation Improvement Program Air Quality Conformity Assessment at II–10–9 (Ex. N–1 to Pls.' Opening Mem.) (same).

Moreover, while nothing in the language of TCM 2 explicitly requires that the increase be achieved, adopting Defendants' position would render TCM 2 virtually meaningless. Defendants argue that the language of TCM 1—to "reaffirm commitment to 28% transit ridership increase,"

1982 Plan at B–2—demonstrates that the drafters of the 1982 Plan knew how to commit to a particular increase if they so intended. As discussed above, this Court agrees that the drafters did not intend to commit to a particular increase through TCM 2, instead intending to commit to a target increase to be set by MTC in consultation with the region's six major transit operators. However, it simply does not follow from this conclusion that the drafters did not intend *any* commitment to increasing transit ridership. There would seem to be little purpose to requiring adoption of a target if that target was never meant to be achieved.

In addition, if the target was not meant to be actually achieved, then there would hardly be any purpose to monitoring ridership gains, as required in TCM 2's implementation schedule. Thus, reading TCM 2 as requiring simply adoption but not achievement of the target would render the fourth step in TCM 2's implementation schedule meaningless. This Court must not adopt an interpretation leading to such a result. *Hughes Air Corp. v. Public Utilities Comm'n,* 644 F.2d 1334, 1338 (9th Cir.1981) (explaining that a "basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless"). As a result, the Court rejects Defendants' argument that TCM 2 requires only adoption of a target but not the target's achievement.[16]

The Court is sympathetic to Defendants' arguments that outside forces—for example, changing work pat-

---

16. It is true that "the Court is not at liberty to extrapolate from the Plan or flesh out strategies not expressly contained therein." *CBE I,* 731 F.Supp. at 1459. Here, however, the Court is satisfied that it has not overstepped its bounds. The Plan expressly requires the adoption of a ridership increase target and also expressly requires that ridership gains be monitored. The rules of statutory interpretation, and not mere extrapolation, require the Court's conclusion that the Plan requires the adopted target increase to be achieved.

terns or individual preferences in choosing to ride or not to ride public transit—might prevent the region from achieving a 15% or, indeed, any other increase in transit ridership. However, this argument is irrelevant to the present inquiry. As this Court has previously held, "States have an unwavering obligation to carry out federally mandated SIPs; thus, where a SIP is violated, liability attaches, regardless of the reasons for the violation." *CBE I*, 731 F.Supp. at 1458. Defendants could have taken the potential effect of individual preferences into account when setting the ridership increase target to be achieved. Now that the target increase has been set, Defendants' only alternative, besides compliance, is to petition the EPA for removal of TCM 2 from the SIP; this Court lacks any power to engage in SIP modification or revision. *CBE III*, 775 F.Supp. at 1296–98.

 Finally, the Court notes that its reading of TCM 2 is consistent with EPA's interpretation of the measure. *See* Dec. 15, 1998 Howekamp Letter at 2 (Ex. F to Def. MTC's Opening Mem.) (letter from regional EPA air division director stating, "We believe that TCM 2 will be fully implemented only when transit ridership increases by 15% from 1982–83 levels.").[17] As the agency responsible for interpreting SIPs, EPA's opinion, as set forth in an opinion letter, is " 'entitled to respect' ... but only to the extent that [it has] the 'power to persuade.' " *Christensen v. Harris County*, 529 U.S. 576, 587–88, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (citation omitted). MTC argues that it is the Federal Highway Administration's (FHWA's) interpretation that should be

given deference under this rule, since the FHWA is responsible for making conformity determinations under the Clean Air Act. *See* Jan. 19, 1999 Lindley Letter (Ex. G to Def. MTC's Opening Mem.) (letter from FHWA California division administrator rejecting the Dec. 15, 1998 Howekamp letter). However, MTC fails to persuade the Court because the EPA is ultimately responsible for the enforcement of SIPs. 42 U.S.C. § 7413; *cf. Am. Lung Ass'n*, 670 F.Supp. at 1291 ("Although the EPA's interpretations of New Jersey's SIP obligations does not control my decision, the agency's views are entitled to deference."). Moreover, even if this Court were to give "respect" to FHWA's opinion letter under *Christensen*, it would reject the opinion as unpersuasive based on its own analysis of what TCM 2 requires.

In summary, and to be explicit, this Court finds that TCM 2 requires the following: (1) that the region's six major transit operators, including MUNI, adopt five-year plans for 1983–87; (2) that MTC consults with the operators on ridership targets and subsequently adopts a target for increased regional transit ridership for 1983–87; (3) that MTC seeks to ensure that the operators' five-year plans are implemented via the implementation of the TIP and allocation of sufficient funding; (4) that MTC monitors ridership gains through annual RFP reports; and (5) that MTC and the region's six major transit operators achieve a regional transit ridership increase of 15% over 1982–83 levels.

 The Court notes MUNI's contention that only MTC, and not any individual

---

**17.** MTC noted at oral argument that Mr. Howekamp failed to mention the 15% increase in a letter dated April 29, 1999, and argued that this omission indicates that EPA changed its interpretation of TCM 2 to no longer require the increase. *See* Apr. 29, 1999 Howekamp Letter at 3–4 (Ex. L–4 to Pls.'s Opening Mem.) (discussing why certain TCMs, including TCM 2, may not be removed from the SIP). However, nothing contained in the April 29 letter is inconsistent with requiring the ridership increase, and this Court is unpersuaded by MTC's argument.

transit operator, can be held liable for a ridership increase on a regional level. However, while TCM 2 imposes no individual ridership increase targets on each transit operator, it defies logic to conclude that, as a result, TCM 2 imposes no obligations on transit operators to help the region as a whole achieve the target increase. MTC operates no systems of public transit directly; thus, the only way the region could achieve a ridership increase would be for at least some of the individual transit operators to increase ridership.[18] Consequently, this Court concludes that, while MTC bears the greatest responsibility in ensuring that the region achieves the target increase, the region's six major transit operators also share collective responsibility under TCM 2.

## V. *Liability*

Moving on to discuss liability, the Court first reiterates that, "Liability in a citizen's enforcement action turns solely on the question of actual compliance.... [T]hus, where a SIP is violated, liability attaches, regardless of the reasons for the violation." *CBE I*, 731 F.Supp. at 1458. As a result, the Court need only concern itself with whether Defendants have actually complied with the five requirements identified above. Defendant MTC's arguments that it should not be held liable because it has acted reasonably and in good faith are irrelevant to the Court's analysis.[19]

### A. *Adoption of Five–Year Plans*

The first step in TCM 2's implementation schedule requires the "6 major transit operators" to "adopt FY 1983–87 plans." 1982 Plan at B–3. Put into context with the rest of the language describing TCM 2, this step can be fairly read as requiring the operators to adopt plans, including productivity improvements, to facilitate increased transit ridership. MUNI is the only remaining operator-Defendant in this case, and the evidence that MUNI adopted a five-year plan for the specified period is undisputed. *See* San Francisco Municipal Railway: 5–Year Plan 1982–1987 ("MUNI Plan") (Exs. G–1 to G–3 to Pls.' Opening Mem.). Thus, the only issue to be decided with respect to this requirement is whether the MUNI Plan included productivity improvements to facilitate increased ridership.[20]

---

18. Because the target increase is regional, it is possible that the target could be met if some transit operators experienced decreased or stagnant ridership levels, so long as the other transit operators experienced sufficiently high ridership increases.

19. MTC cites *Trustees for Alaska v. Fink,* 17 F.3d 1209 (9th Cir.1994), as supporting its argument that a good-faith or reasonableness standard should apply. However, that case is inapplicable here because of a key factual distinction. In *Trustees,* the city of Anchorage conditioned its commitment to a bus expansion program on its ability to obtain sufficient funding. *Id.* at 1212. Anchorage made such conditioning apparent by " 'pepper[ing] the plan] with [such] candid statements concerning the anticipated difficulty of obtaining' the necessary funding." *Id.* at 1212 n. 5 (quoting district court opinion) (second alteration in original). Thus, the city could not be held

liable for failing to expand bus service when it exerted good-faith, but unsuccessful, efforts to obtain funding. In this case, by contrast, TCM 2 contains no such excusing condition. *Compare, e.g.,* TCM 3, 1982 Plan at B–4 (containing as part of its implementation schedule, *"If funding exists,* transit operators implement plans to expand services." (emphasis added)), *with* TCM 2, 1982 Plan at B–3 (containing no such conditional language).

20. TCM 2 does not require MUNI, or any other transit operator, to plan for any specific increase in its own ridership levels. The measure only requires that the region as a whole achieve a 15% ridership increase. Notably, Plaintiffs admit that MUNI was never required to achieve a 15% ridership increase on its own; they claim, instead, that MUNI only has to bring its ridership back up to 1982 levels in order for the region to achieve a 15% increase. Pls.' Opp'n at 13.

Even viewed in the light most favorable to Plaintiffs, the evidence here is sufficient to conclude that the MUNI Plan satisfies this requirement.[21] The plan had as its first goal, "To meet the needs of residents and visitors for safe, convenient and inexpensive travel within San Francisco and between San Francisco and the Bay Region." *Id.* at 47. Throughout the description of this goal, the plan discussed the importance of meeting demand, which it predicted would increase by 10% for downtown commute service, 2% for peak non-downtown service, 4.6% by off-peak non-downtown service, and 22% for cable-car service by 1987. *Id.* at 48. In developing strategies to help meet the projected demand increases, MUNI adopted three main approaches: "(1) MUNI will improve system reliability. (2) MUNI will improve its operating efficiency and resource utilization in order to provide increased system capacity to meet demand. (3) MUNI will improve transit convenience by removing disincentives and barriers to transit." *Id.* at 51. The second of these approaches—improving efficiency—clearly concerns improving productivity, which is the focus of TCM 2; the first—improving system reliability—also arguably concerns productivity.

Although it would be inadequate merely to state these approaches with nothing more, the MUNI Plan identified numerous strategies to improve reliability and efficiency and also set forth specific performance standards by which to evaluate those strategies. *Id.* at 53–56 (Table 14), 61–85. Beyond that, the MUNI Plan included a capital improvement program that prioritized projects based on six criteria, most of which related to productivity

improvements.[22] *Id.* at 2–21 to 2–25. In short, the text of the MUNI Plan adequately demonstrates that it addressed productivity improvements with a goal of facilitating increased ridership. Consequently, MUNI has satisfied its obligations under the first requirement of TCM 2.

### B. *Consultation and Adoption of Ridership Targets*

■ The second step in TCM 2's implementation schedule requires MTC to "consult[ ] with [the transit] operators on ridership targets." 1982 Plan at B–3. The brief description of TCM 2 states that MTC should "adopt [a] ridership increase target for 1983–1987" following these consultations. *Id.*

With respect to the consultation requirement, the Court notes that, in response to a Public Records Act request for "all documents reflecting MTC's consultation with transit operators regarding the ridership increase target for 1983–87," MTC responded that, "We have no such documents on file." Attach. 3 to Chytilo Decl. at 1 (Ex. A–3 to Pls.' Opening Mem.). While MTC correctly points out that this indicates only the lack of written records and does not prove outright that no consultation occurred, MTC presents no contrary evidence stating that any consultation did occur. Moreover, MUNI admitted in its answer that, "MTC has not consulted with MUNI ... to ensure the implementation of TCM # 2 ridership allocations." MUNI Answer ¶ 60. Thus, the only evidence in the record before this Court indicates that MTC never consulted with the transit operators regarding target ridership increases. It therefore goes without saying that

---

**21.** Despite Plaintiffs' arguments to the contrary, nothing in TCM 2 leads this Court to conclude that the measure requires MUNI to consider how to attract latent demand as part of its planning.

**22.** The six criteria were: increased efficiency, improved convenience, improved service capacity, improved handicapped accessibility, and improved reliability.

the evidence, even viewed in the light most favorable to MTC, demonstrates that MTC failed to perform the required consultations.

■ However, the Court finds MTC's liability on the consultation issue to be irrelevant since MTC adopted a 15% ridership increase as the target to be achieved under TCM 2. The purpose of the required consultations was for MTC to determine a suitable target increase for regional transit ridership. Now that MTC has already adopted a target, this purpose has become moot. Thus, although MTC has failed to comply with the consultation requirement of TCM 2 and liability therefore technically attaches, this Court finds such liability to be inconsequential given MTC's adoption of a target increase.

### C. *MTC Support via TIP Implementation and Funding Allocations*

The third step in TCM 2's implementation schedule requires that "MTC, through implementation of the TIP [Transportation Improvement Plan] and allocation of regional funds, seeks to ensure [that the transit] operators' 5–year plans are implemented." 1982 Plan at B–3. Plaintiffs base their allegations of liability on their claim that the transit operators never prepared adequate plans and, as a result, "clearly MTC has not ensured their implementation." Pls.' Opening Mem. at 21. However, as discussed above, this Court finds that MUNI, the only operator-Defendant remaining in this suit, prepared an adequate five-year plan. Thus, the alleged lack of adequate operator plans fails as a grounds for finding MTC liable on this requirement. Because Plaintiffs have presented no other evidence to support their

allegation of liability here,[23] and because it would be Plaintiffs' burden to prove such liability at trial, this Court must rule in favor of Defendants on this issue.

### D. *Monitoring of Ridership Gains in RFP Reports*

The fourth and final step in TCM 2's implementation schedule requires that "[r]idership gains [be] monitored through annual RFP [Reasonable Further Progress] reports." 1982 Plan at B–3. Although it is unclear whether Plaintiffs actually allege liability on this step, Plaintiffs have presented no evidence to indicate that MTC failed to comply. Therefore, no finding of liability is appropriate.

### E. *Achievement of a 15% Ridership Increase*

■ Finally, TCM 2 requires the achievement of a 15% increase in regional transit ridership over 1982–83 levels. The Court finds, as discussed below, that Defendants are liable for failing to achieve this target increase.

First, MTC's own documents state that the ridership increase has not been achieved. *See, e.g.,* Bay Area Air Quality 1987 RFP Report at 44 (Ex. M–2 to Pls.' Opening Mem.) (stating that regional transit ridership decreased between 1982–83 and 1987–88); 1990–94 Transportation Improvement Program Air Quality Conformity Assessment at II–10–9 to II–10–10 (Ex. N–1 to Pls.' Opening Mem.) (noting that the increase still had not been achieved by 1989–90, and further containing a table showing that ridership was *lower* in 1989–90, and in every year except 1983–84, than in 1982–83); 1997 Transportation Improve-

---

23. Plaintiffs also claim that MTC is liable for failing to complete this step of the implementation schedule because the 15% ridership increase was never achieved. However, this Court finds the actual achievement of the

ridership increase to be a separate requirement of TCM 2. It therefore discusses allegations and evidence of failing to achieve the increase in a separate section of this Order. *See infra* at Section V–E.

ment Program Air Conformity Analysis at 5–6 (Ex. N–2 to Pls.' Opening Mem.) (same for 1994–95). Thus, even relying only on MTC's official reports, it is indisputable that the region fell far short of the 15% targeted increase—and, in fact, that by 1994–95, the region had failed to achieve *any* ridership increase at all, instead realizing a decrease of over 40 million annual boardings compared with 1982–83 levels. *Id.*

 Plaintiffs have also provided the Court with their own ridership data, summarized from ridership statistics collected by the U.S. Department of Transportation's Federal Transit Administration. *See* Yung Decl. ¶¶ 8–9, Attach. 3.[24] Plaintiffs' summary shows that, for the period from 1982–83 up through 1998–99, the only year in which regional transit ridership was above 1982–83 levels was 1983–84.[25] *Id.* at Attach. 3. In 1998–99, ridership was approximately 20 million annual boardings below what it was in 1982–83. *Id.*

In short, the evidence more than amply demonstrates that a 15% ridership increase was never achieved, especially given

that Defendants have produced no evidence to the contrary and admitted at oral argument that they could not produce such evidence. This Court therefore finds both Defendants liable for failing to achieve the increase in transit ridership required under TCM 2.

## VI. *Remedy*

Given the above findings on liability, the only issue remaining in this case is the determination of an appropriate remedy. Plaintiffs seek injunctive relief requiring that the 15% increase be met by September 1, 2006.[26] They argue that a five-year implementation schedule would be appropriate since that is what TCM 2 originally intended. However, given the parties' minimal briefing and oral argument with respect to remedies, this Court is not prepared to declare a scheme for injunctive relief at this time.[27]

Moreover, the parties' overwhelming emphasis on procedural arguments and liability implies to the Court that these were the most disputed issues. Now that liability has been found, the Court believes that the parties would benefit from further set-

24. Defendants object to the admissibility of this data on grounds of no foundation for personal knowledge and hearsay. However, both objections fail, and Plaintiffs' evidence is admissible. First, personal knowledge can be based on a review of documents, as it is here. *United States v. Matsumaru*, 244 F.3d 1092, 1102 (9th Cir.2001); *Washington Cent. R.R. Co. v. Nat'l Mediation Bd.*, 830 F.Supp. 1343, 1353 (E.D.Wash.1993). Second, as public records, the documents underlying Yung's declaration qualify as exceptions to the hearsay rules under Federal Rule of Evidence 803(8) and are therefore admissible. Since Plaintiffs have made the underlying documents available to Defendants, Yung's summary is admissible under Federal Rule of Evidence 1006.

25. Curiously, some of the numbers provided by Plaintiffs differ slightly (generally by less than 1%) from those provided in MTC's re-

ports. However, the Court does not find these differences to be significant in the context of the current dispute because ridership has not even approached the required 15% increase. Similarly, even if, as Defendants' contend, some of the transit operators used flawed methodologies in calculating ridership levels, it would be unreasonable to assume that such calculation errors resulted in a discrepancy large enough to reverse the Court's finding on liability.

26. Plaintiffs also seek the imposition of civil penalties, but they explicitly reserve that issue for later adjudication or settlement. Pls.' Opening Mem. at 23 n. 19.

27. Similarly, as noted at oral argument, the Court stays decision on the 28 U.S.C. § 2462 statute of limitations issue raised by Defendants until the issue of penalties is fully before the Court.

tlement discussions to develop an appropriate remedy. To facilitate settlement, the Court hereby refers the remedies question to one of the district's magistrate judges, to be assigned at random.

## CONCLUSION

In summary, each party's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART in accordance with the above discussion. IT IS FURTHER ORDERED that:

1. The parties are referred to a magistrate judge, to be assigned randomly, for a mandatory settlement conference on a suitable remedy for Defendants' failure to comply with TCM 2.

2. Plaintiffs' request for injunctive relief and Defendants' motions to limit or deny the imposition of penalties are stayed pending the outcome of the settlement conference. It is this Court's hope that all issues relating to relief will be resolved during settlement, thus making adjudication on these matters unnecessary.

3. Within ten days of the conclusion of the settlement conference, the parties shall file a joint statement informing this Court of the agreements reached during settlement and the issues, if any, that remain for this Court to adjudicate.

**IT IS SO ORDERED.**