17 F.3d 1209
 38 ERC 1389, 24 Envtl. L. Rep. 20,550
 TRUSTEES FOR ALASKA; Alaska Center for the Environment;
Anchorage Audobon Society, Plaintiffs-Appellants,
v.
Tom FINK, in his capacity as Mayor of the Municipality of
Anchorage; and the Municipality of Anchorage,
Defendants-Appellees.
 No. 92-36932.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 1, 1994.
Decided March 1, 1994.
 
 Michael M. Wenig, Eric Smith, Anchorage, Alaska, for the plaintiffs-appellants.
 John W. Phillips, Heller Ehrman White & McAuliffe, Anchorage, Alaska, for the defendants-appellees.
 Appeal from the United States District Court for the District of Alaska.
 Before: WRIGHT, REAVLEY,* and LEAVY, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge.
 
 
 1
 Trustees for Alaska sued Anchorage, arguing that Part D of the 1977 Amendments to the Clean Air Act, 42 U.S.C. Secs. 7501-7508, did not allow the municipality to make conditional commitments to Traffic Control Measures in Alaska's State Implementation Plan. We hold that Anchorage could and did condition its commitment to expanding mass transit bus service upon the availability of funding. And we affirm the district court's finding that Trustees failed to meet their burden of showing that Anchorage violated the condition by not taking reasonable steps to locate funding.
 
 BACKGROUND
 
 2
 The labored history of the Clean Air Act is well documented. See, e.g., Coalition for Clean Air v. Southern Cal. Edison Co., 971 F.2d 219, 221-23 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1361, 122 L.Ed.2d 740 (1993); Delaney v. EPA, 898 F.2d 687 (9th Cir.), cert. denied, 498 U.S. 998, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990); Connecticut Fund for the Environment, Inc. v. EPA, 672 F.2d 998 (2d Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982). This case arises under Part D of the 1977 Amendments to the Act, 42 U.S.C. Secs. 7501-7508, which extended until 1987 the deadline for attaining the National Ambient Air Quality Standard for carbon monoxide.[1]
 
 
 3
 Like many American cities, Anchorage has a long-standing air pollution problem. See, e.g., Southern Cal. Edison, 971 F.2d at 221 (describing California's South Coast Air Basin pollution); S.Rep. No. 228, 101st Cong., 2d Sess. 55-56 (1990), reprinted in 1990 U.S.C.C.A.N. 3385, 3441-42 (listing 44 CO nonattainment cities, including Anchorage). In 1978 the EPA classified Anchorage as a nonattainment area. Anchorage needed to reduce CO levels by 23 percent, and 90 percent of all CO emissions came from cars.
 
 
 4
 Local officials devised the Anchorage Air Quality Plan (Anchorage Plan), which included a plan to expand the mass transit bus fleet (and service) from 49 buses to between 124 and 161 buses. In 1982, Alaska incorporated the Anchorage Plan by reference into a new SIP that it submitted to the EPA for approval.[2] Anchorage has not significantly expanded its bus fleet, and service hours have declined.
 
 
 5
 Using the citizen suit provision, 42 U.S.C. Sec. 7604, Trustees for Alaska sued Anchorage for violating the 1982 Alaska SIP.[3] After Judge Singleton denied the parties' cross-motions for summary judgment, they stipulated to have him decide the case on the record pursuant to Fed.R.Civ.P. 52. He ruled that Anchorage had conditioned its commitment to expand bus service on the availability of additional funding. He also found that Anchorage had taken reasonable steps to locate funding, but that those efforts had been unsuccessful.
 
 ANALYSIS
 
 6
 The district court had jurisdiction under 42 U.S.C. Secs. 7604(a)(1) & (f)(3). We have jurisdiction under 28 U.S.C. Sec. 1291.
 
 
 7
 1. ANCHORAGE COULD CONDITION ITS COMMITMENT TO THE BUS EXPANSION TCM IN THE 1982 SIP UPON FUNDING.
 
 
 8
 We review de novo the district court's interpretation of Part D. Central Montana Elec. Power Co-op, Inc. v. Administrator of Bonneville Power Admin., 840 F.2d 1472, 1476 (9th Cir.1988).
 
 
 9
 To get the 1987 extension, Congress required EPA approval of a new SIP that "shall ... commit the financial ... resources necessary to carry out" the TCMs. 42 U.S.C. Sec. 7502(b)(7). Trustees argue that we must hold Anchorage to the unconditional command of this clear and unambiguous language. See Southern Cal. Edison, 971 F.2d at 227 (no reason to look beyond language of Clean Air Act when clear) (citing Toibb v. Radloff, 501 U.S. 157, ----, 111 S.Ct. 2197, 2200, 115 L.Ed.2d 145 (1991)), cert. denied, --- U.S. ----, 113 S.Ct. 1361, 122 L.Ed.2d 740 (1993); cf. Delaney, 898 F.2d at 690 (1982 and 1987 Part D deadlines, although "draconian," are clear, unambiguous, and absolute).
 
 
 10
 We disagree. In construing a statute of first impression, we look first to the language of the statute. Central Montana Elec., 840 F.2d at 1477. The language of Sec. 7502(b)(7) is simple, but unclear. Commitments are often subject to conditions precedent or conditions subsequent, and the word "shall" does not necessarily signify that Congress intended to foreclose either. It clearly and unambiguously signifies that a commitment must be made, but the nature of that commitment is left undefined. We must look beyond the plain language of the statute.
 
 
 11
 We may defer to the EPA's interpretation of Part D, if that interpretation is reasonable. Central Montana Elec., 840 F.2d at 1476-77. In a Guidance published pursuant to Sec. 7508, the EPA interpreted Sec. 7502(b)(7) to allow conditional commitment to a program that had not yet received funding. See State Implementation Plans; Approval of 1982 Ozone and Carbon Monoxide Plan Revisions for Areas Needing an Attainment Date Extension, 46 Fed.Reg. 7183 (1981) ("If a particular measure cannot be implemented because the necessary funds cannot be obtained ... then the measure may justifiably be delayed."); see also id. at 7193 (Appendix C) (model for conditional commitment based on funding).[4]
 
 
 12
 We think that the EPA's interpretation is reasonable. The legislative history of Part D shows that Congress intended that "economic or social cost" should be assessed when deciding if a TCM listed in Sec. 7410 was "reasonably available" under Sec. 7502(b)(2). S.Rep. No. 127, 95th Cong., 1st Sess. 40 (1977). And a new SIP "must require that funds reasonably available to the state or local government be used to improve public transportation." H.R.Rep. No. 564, 95th Cong., 1st Sess. 157 (1977), reprinted in 1977 U.S.C.C.A.N. 1077, 1502, 1538 (emphasis added) (history of Part D, referring to mass transit TCMs under Sec. 7410(a)(3)(D), (c)(5)(B)). Although planning usually precedes funding, unforeseeable environmental or economic changes can and do disrupt those plans. This record tells us that available state and federal funding shrank and plummeting oil prices prompted a local exodus, lowered property values and decimated tax revenues. The recent Los Angeles earthquake, with its imminent impact on traffic and transit patterns and state and local budgets, is another paradigm example.
 
 
 13
 We hold that Anchorage could make a Sec. 7502(b)(7) SIP commitment that was conditioned on funding becoming available.
 
 
 14
 2. ANCHORAGE DID CONDITION ITS COMMITMENT TO THE BUS EXPANSION PROGRAM UPON FUNDING BECOMING AVAILABLE.
 
 
 15
 It does not necessarily follow that all expressions of concern create conditions. Every TCM in the 1982 SIP had to be submitted to the EPA in an enforceable form. 42 U.S.C. Sec. 7502(c); Action for Rational Transit v. West Side Highway Project, 699 F.2d 614, 616 (2d Cir.1983) (SIP not enforceable apart from specific TCM strategies); Citizens for a Better Environment v. Deukmejian, 746 F.Supp. 976, 979 (N.D.Cal.1990) ("Court is not at liberty to extrapolate from the Plan or flesh out strategies not expressly contained therein") (citation omitted); cf. Guidance for Determining Conformity of Transportation Plans, Programs and Projects with Clean Air Act Implementation Plans During Phase 1 of the Interim Period 17 n. 13 (1991) (test of commitment is test of enforceability).
 
 
 16
 Without this judicial check, state and local governments could use a conditional commitment as a gimmick to delay indefinitely hard political choices. American Lung Ass'n v. Kean, 871 F.2d 319, 325 (3rd Cir.1989) (1977 Amendments added bite to Act to ensure compliance with NAAQS) (citing David P. Curie, Relaxation of Implementation plans Under the 1977 Clean Air Act Amendments, 78 Mich.L.Rev. 155, 187 (1979) (1977 Amendments as federal blackmail of states to comply with Clean Air Act)).
 
 
 17
 The plain language of the Anchorage Plan shows that the city did not make an unconditional commitment to expanding bus service. The Anchorage Plan expressly warned that any "local funding requirement makes any provision of the entire [bus] supply extremely questionable" and that before further expansion could occur, the "gap between operating expenses and fares must be closed and alternative sources of revenue uncovered."[5]
 
 
 18
 To comply with the requirement of Sec. 7502(c), the condition must be considered an independently enforceable SIP obligation. And to be enforced, the condition must be construed as a commitment to seek out funding. The remaining question is, did Anchorage violate that commitment?
 
 
 19
 3. TRUSTEES FAILED TO MEET THEIR BURDEN OF SHOWING THAT ANCHORAGE VIOLATED THE 1982 ALASKA SIP BY NOT TAKING REASONABLE STEPS TOWARDS SATISFYING THE CONDITION.
 
 
 20
 Trustees had the burden of showing that Anchorage violated its obligation to seek out funding for bus expansion. Environmental Study & Protection v. PAC, 464 F.Supp. 143 (D.Conn.1978) (citing Friends of the Earth v. Carey, 535 F.2d 165, 173 (2d Cir.1976)). But Trustees invited Judge Singleton to decide the case on an abbreviated record. He found that it showed Anchorage had made good faith efforts to obtain funding.
 
 
 21
 Anchorage made grant requests. Although it could get expansion capital through state and federal grants, the transit authority projected an operating deficit of $25,000,000 by 1987. The city charter barred the city from raising taxes to pay for additional operating expenses. Voters rejected a gasoline tax and two bond proposals. And now, after reevaluating the role of mass transit in fighting CO pollution, Anchorage has abandoned the Anchorage Plan bus program in a new SIP presently being evaluated by the EPA.
 
 
 22
 Trustees did not show that Anchorage's attempts to get funding were unreasonable. And they failed to come forward with any evidence showing how Anchorage could have done more. Instead, they argued that the failure to expand bus service in itself established a violation because Part D did not allow conditional commitments. As we have said, that is not so. On this limited record, we do not conclude that the district judge was clearly erroneous.
 
 
 23
 The judgment of the district court is AFFIRMED. The parties will bear their own costs on this appeal.
 
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge, Fifth Circuit, sitting by designation
 
 
 [1]
 Part D of the 1977 Amendments gave areas in nonattainment of the National Ambient Air Quality Standard (NAAQS) for carbon monoxide (CO) until 1982 to attain, or 1987 if the EPA approved a new State Implementation Plan (SIP). 42 U.S.C. Sec. 7502(a)(2). To get EPA approval, the new SIP had to use every Transportation Control Measure (TCM) listed in Sec. 7408 that was "reasonably available," 42 U.S.C. Sec. 7502(b)(2); Delaney, 898 F.2d at 692, and had to include a contingency plan that used "all possible measures." Id. (quoting Guidance Document for Correction of Part D SIP's For Nonattainment Areas 32-33, January 27, 1984). And it had to "identify and commit the financial ... resources necessary to carry out" the TCMs in the SIP. 42 U.S.C. Sec. 7502(b)(7)
 The Act was not a toothless lion. If the EPA did not approve the 1982 SIP, it could have imposed on Alaska an EPA-designed Federal Implementation Plan. 42 U.S.C. Sec. 7410(c); Southern Cal. Edison, 971 F.2d at 222. And if the SIP was approved but ignored, federal funds could have been withheld. 42 U.S.C. Secs. 7506(a), 7616(b)(2).
 
 
 [2]
 Part D empowered Alaska's governor to delegate to Anchorage officials the authority to develop and implement the local component part of the SIP. See 42 U.S.C. Secs. 7502(a)(2), 7504(a). Anchorage requested and received this gubernatorial authority pursuant to Alaska Stat. Sec. 46.03.210 (1982). The EPA approved the SIP piecemeal between 1982 and 1986, after which it was promulgated as a regulation, see 40 C.F.R. Sec. 52.75 (1992) (Alaska SIP), as required by 42 U.S.C. Sec. 7410(h)(2)
 
 
 [3]
 Having "the force and effect of federal law," the EPA-approved and promulgated Alaska SIP is enforceable in federal courts. Union Electric Co. v. E.P.A., 515 F.2d 206, 211 & n. 17 (8th Cir.1975), aff'd, 427 U.S. 246, 96 S.Ct. 2518, 49 L.Ed.2d 474 (1976)
 
 
 [4]
 If the EPA misinterpreted the degree of commitment needed, Congress did not correct the error with the 1990 Amendments. All post-1977 SIPs needed assurance of funding, even those not developed under Part D. See 42 U.S.C. Sec. 7410(a)(2)(F)(i) (1983) (SIP must contain "necessary assurances ... [of] adequate ... funding ..."). Congress did not significantly change this language in 1990. See 42 U.S.C. Sec. 7410(a)(2)(E) (New SIPs "shall ... provide necessary assurances that the ... local government ... will have adequate personnel, funding, and authority."). And the EPA has again interpreted the Act to allow conditional commitments. See Guidance for Determining Conformity of Transportation Plans, Programs and Projects with Clean Air Act Implementation Plans During Phase 1 of the Interim Period 17 n. 13 (1991) ("test for specificity and reality of commitment must be about the same as would be applied if EPA or a citizen were to seek a court order for implementation of the specific TCM.")
 
 
 [5]
 As the district court found, the Anchorage plan was "peppered with [such] candid statements concerning the anticipated difficulty of obtaining" the necessary funding. The statements in the Anchorage Plan obviously, if inartfully, conditioned Anchorage's commitment to the TCM on funding