BAYVIEW HUNTERS POINT COM-
MUNITY ADVOCATES; Communi-
ties for a Better Environment; Latino
Issues Forum; Our Children's Earth
Foundation; Sierra Club; Transporta-
tion Solutions Defense and Education
Fund; Urban Habitat Program; The
Tide Center, Plaintiffs–Appellees,

v.

METROPOLITAN TRANSPORTATION
COMMISSION, Defendant–
Appellant,

and

San Francisco Municipal Railway;
Alameda–Contra Costa Transit
District, Defendants.

No. 02–17352.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 8, 2003.

Filed April 6, 2004.

Amended on Denial of Rehearing
and Rehearing En Banc
June 2, 2004.*

* With the opinion as amended, Judge Hawkins and Judge Clifton voted to deny both the petition for rehearing and petition for rehearing en banc. Judge Thomas voted to grant the petition for rehearing and deny the petition for rehearing en banc.

David D. Cooke, San Francisco, CA (argued); Francis Chin, Oakland, CA; and Melanie Morgan, Oakland, CA, for the defendant-appellant.

Deborah S. Reames, Oakland, CA (argued); Anne C. Harper, Oakland, CA; Suma Peesapati, Oakland, CA; Alan M. Ramo, San Francisco, CA; Helen H. Kang, San Francisco, CA; and Marc S. Chytilo, Santa Barbara, CA, for the plaintiffs-appellees.

Before: HAWKINS, THOMAS, and CLIFTON, Circuit Judges.

CLIFTON, Circuit Judge:

The Metropolitan Transportation Commission plans, coordinates, and finances regional transportation in the San Francisco Bay Area. Over the past twenty five years, MTC has been one of several government agencies responsible for preparing and implementing programs to attain federal air quality standards in the Bay Area in order to comply with the Clean Air Act. One component of a plan initially adopted in 1982 was called Transportation Control Measure 2, or, in the tradition of acronyms which infects both government and environmental regulation, TCM 2. TCM 2 was designed to reduce air pollutants by increasing the use of public transit. The reductions in emissions estimated to result from TCM 2 were predicated on a "target" ridership increase of 15% over 1982–83 ridership levels. In this legal action, Plaintiffs Bayview Hunters Point Community Advocates and others (collectively "Bayview") contend that TCM 2 imposed an enforceable obligation upon MTC to increase ridership by 15% over 1982–83 levels, and that MTC's failure to achieve such an increase constitutes a violation of TCM 2.

The District Court granted summary judgment in Bayview's favor and issued an injunction requiring MTC to achieve a 15% increase in ridership over 1982–83 levels. *See Bayview Hunters Point Cmty. Advocates v. Metropolitan Transp. Comm'n,* 177 F.Supp.2d 1011 (N.D.Cal.2001) (*"Bayview I"*); *Bayview Hunters Point Cmty. Advocates v. Metropolitan Transp. Comm'n,* 212 F.Supp.2d 1156 (N.D.Cal. 2002) (*"Bayview II"*). On appeal, MTC argues that the District Court erred in concluding that TCM 2 constitutes a binding commitment to achieve a 15% increase in public transit ridership.

The language and logic of TCM 2 lead us to conclude that TCM 2 does not impose an enforceable obligation on MTC to increase public transit ridership. We therefore reverse the District Court's judgment and injunction.

## I. BACKGROUND

### A. Regulatory Framework

The Clean Air Act (CAA) requires the U.S. Environmental Protection Agency (EPA) to promulgate health-based standards for certain pollutants, including hydrocarbons and nitrogen oxides which produce ground level ozone, also known as "smog." These standards are called the National Ambient Air Quality Standards (NAAQS). 42 U.S.C. § 7409(a), (b). Each state is required under the CAA to adopt a State Implementation Plan (SIP) to satisfy the NAAQS requirements. 42 U.S.C. § 7410(a)(1). Specifically, each state is mandated under § 110(a) of the Act, 42 U.S.C. § 7410(a), to adopt a "plan which provides for implementation, maintenance, and enforcement" of the ambient air quality standards and to submit its SIP to the EPA for approval. Each SIP must include enforceable emission limitations and other control measures necessary to attain the NAAQS, as well as timetables for compliance. 42 U.S.C. § 7410(a)(2)(A). A SIP is subject to approval by the EPA to see that it meets the criteria specified in § 7410.

A SIP, "once adopted by a state and approved by the EPA, becomes controlling and must be carried out by the state." *Friends of the Earth v. Carey*, 535 F.2d 165, 169 (2nd Cir.1976), *cert. denied*, 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977). Approved SIPs are enforceable by either the State, the EPA, or via citizen suits brought under Section 304(a) of the CAA. *See Baughman v. Bradford Coal Co.*, 592 F.2d 215, 217 n. 1 (3d Cir.1979); 42 U.S.C. § 7604(a).

A state may elect to include emission reduction strategies called Transportation Control Measures (TCMs) as part of its SIP. 40 C.F.R. § 51.100(n)(7). A TCM is any measure contained in a SIP whose purpose is to reduce air pollutants from transportation sources (e.g., cars) by reducing vehicle use or changing traffic flow or congestion conditions. *See* 40 C.F.R. § 93.101.

### B. Factual Summary

MTC, the Bay Area Air Quality Management District, and the Association of Bay Area Governments served as co-lead agencies responsible for the preparation and implementation of the 1982 Bay Area Air Quality Plan ("1982 SIP"). The 1982 SIP set forth "an approximate time schedule for adopting and implementing the control programs necessary to attain the federal air quality standards for ozone and carbon monoxide by the 1987 deadline specified by the Clean Air Act." It contained "three categories of minimum control measures as defined by EPA," one of which was "reasonably available transportation control measures." The EPA approved the 1982 SIP in its entirety. 48 Fed.Reg. 57130, 57132 (Dec. 28, 1983).

The 1982 SIP contained ten TCMs that were to be implemented to reduce both hydrocarbon and carbon monoxide emissions region-wide. As one of several measures involving public transportation, TCM 2 dealt with ridership levels. TCM 2 was contained on a single page and provided, in its entirety, as follows:

TCM #2: Support post–1983 improvements identified in transit operator's 5–year plans, after consultation with the operators adopt ridership increase target for 1983–1987.

EMISSION REDUCTION ESTIMATES: These emission reduction esti-

mates are predicated on a 15% ridership increase. The actual target would be determined after consultation with the transit operators.

[Measurements of emission reductions of hydrocarbons, carbon dioxide, and nitrogen oxide in tons/day]

| | 1983 | 1984 | 1985 | 1986 | 1987 |
|---|---|---|---|---|---|
| HC | 0 | .23 | .42 | .60 | .72 |
| CO | 0 | 2.03 | 4.03 | 5.80 | 7.15 |
| $NO_x$ | 0 | .36 | .68 | .94 | 1.04 |

COST: Costs of maintaining the existing level of services currently programmed in regional allocations. Ridership increases would come from productivity improvements, thus additional costs would be moderate.

IMPLEMENTATION SCHEDULE:

● 6 major transit operators[1] adopt FY 1983–87 plans by July, 1982.

● MTC consults with operators on ridership targets by Jan., 1983.

● MTC, through implementation of the TIP [Transportation Improvements Plan] and allocation of regional funds, seeks to ensure operators' 5–year plans are implemented.

● Ridership gains are monitored through annual RFP [Reasonable Further Progress] reports.

DESCRIPTION OF CONTROL MEASURE: This measure is basically an extension of TCM # 1. Since federal funds for transit purposes are being cut back, many of the improvements identified in the 5 year plans deal with increased productivity. Thus, while the size of the transit system may not grow significantly, the ridership is expected to increase.

OTHER IMPACTS

● 31,600 gallons of gasoline saved.

● Alternatives to automobile travel will be increased.

MTC subsequently adopted the 15% estimate as the actual target for the ridership increase. But despite the implementation of TCM 2, by 1987 transit ridership had increased by only 6% above the 1982–83 levels, rather than the 15% that was set as the target.

The overall emission reduction estimates set in the 1982 SIP were not met, either. In 1989, two organizations—Communities for a Better Environment and the Sierra Club—filed suit against MTC and related state transit agencies to implement the contingency plan provisions of the 1982 SIP in light of the shortfall in emissions reduction. *See Citizens for a Better Env't v. Deukmejian*, 731 F.Supp. 1448 (N.D.Cal.1990) ("*CBE I*"); *Citizens for a Better Env't v. Deukmejian*, 746 F.Supp. 976 (N.D.Cal.1990) ("*CBE II*"); and *Citizens for a Better Env't v. Wilson*, 775 F.Supp. 1291 (N.D.Cal.1991) ("*CBE III*") (consolidated actions). The District Court determined that "MTC [was] liable for failing to implement the transportation contingency plan," and in turn ordered MTC to "adopt sufficient Transportation Control Measures within six months of September 19, 1989 to bring the region back within the 'Reasonable Further Progress' line." *CBE 1*, 731 F.Supp. at 1461. In February of 1990, MTC adopted 16 "Contingency TCMs."

Air quality monitoring indicated that the Bay Area region satisfied the ozone standards from 1990 to 1992. *See* 60 Fed.Reg. 27028 (May 22, 1995). In 1993 MTC, the Bay Area Air Quality Management District, and the Association of Bay Area Governments proposed to replace the 1982 SIP with a "maintenance SIP," which the

---

**1.** The six transit operators are: the San Francisco Municipal Railway (MUNI), the Alameda–Contra Costa Transit District, Bay Area Rapid Transit, Golden Gate Transit, San Mateo County Transit, and the Santa Clara Valley Transportation Authority.

EPA approved on May 22, 1995. *See* 60 Fed.Reg. 27028 (May 22, 1995). When the Bay Area later fell out of attainment of the ozone NAAQS, MTC and its co-lead agencies prepared a number of revised SIPs— the 1999 Ozone Attainment Plan, the 2001 Proposed Ozone Attainment Plan, and the Revised 2001 Ozone Attainment Plan— aimed at getting back into compliance with the ozone standard.

TCM 2 has remained a part of each subsequently revised Bay Area SIP. Though MTC in preparing its 1999 Ozone Attainment Plan suggested to the EPA that TCM 2 and other older TCMs be removed from the SIP, the EPA rejected this suggestion on the grounds that TCM 2 and the other TCMs "clearly have emissions reductions in the SIP" and that MTC had failed to propose new measures "to provide the equivalent or greater emissions reductions." A 15% increase in ridership over the 1982–83 baseline period has never been achieved, however. In the last complete fiscal year for which there are ridership statistics in the record, FY 2000–01, transit ridership had increased about 12.5% over the 1982–83 baseline.

Bayview filed a CAA citizen suit under 42 U.S.C. § 7604(a) against MTC, the City and County of San Francisco (as the legal representative of the city's local public transit agency, the San Francisco Municipal Railway, or MUNI), and the Alameda–Contra Costa Transit District (which serves the East Bay communities) in February 2001. Bayview alleged that the parties were in violation of TCM 2 as they had failed to achieve a 15% increase in public transit ridership above 1982–83 levels, and sought injunctive relief and an award of civil penalties. The Alameda–Contra Costa Transit District settled with Bayview at the outset of the case.

In ruling on cross-motions for summary judgment, the District Court interpreted TCM 2 to impose five separate requirements:

1. that the region's six major transit operators, including MUNI, adopt five-year plans for 1983–87;

2. that MTC consults with the operators on ridership targets and subsequently adopts a target for increased regional transit ridership for 1983–87;

3. that MTC seeks to ensure that the operators' five-year plans are implemented via the implementation of the TIP [Transportation Improvement Plan] and allocation of sufficient funding;

4. that MTC monitors ridership gains through annual RFP [Reasonable Further Progress] reports; and

5. that MTC and the region's six major transit operators achieve a regional transit ridership increase of 15% over 1982–83 levels.

*Bayview I*, 177 F.Supp.2d at 1028.

There is no dispute concerning the first four requirements. MTC acknowledged that it was required under TCM 2 to implement those specific strategies, sometimes described as a four-part "implementation schedule." *Id.* at 1026. As to those four requirements, though, the District Court concluded either that MTC was not liable for failing to fulfill those commitments or that its failure was inconsequential. *Id.* at 1029–31.

The current controversy concerns the fifth requirement, that a 15% increase in ridership be achieved. Defendants argued that TCM 2 did not establish such a requirement, but merely 'an unenforceable "target." The District Court disagreed. *Id.* at 1026–28. It concluded that actual achievement of the ridership increase was a "separate requirement of TCM 2." *Id.* at 1031 n. 23. As a result, the District Court

found both MTC and MUNI liable for violating requirement (5), and granted summary judgment on that issue to Bayview. MUNI thereafter settled with Bayview, leaving MTC as the sole remaining defendant.

The District Court granted Bayview's subsequent motion for injunctive relief and issued a permanent injunction against MTC in July 2002. *Bayview II,* 212 F.Supp.2d at 1158. The permanent injunction requires MTC to increase public transit ridership to the 15% target increase level over the 1982–83 baseline. *Id.* at 1170. The requirement was computed to be 544.8 million annual transit boardings. That level must be achieved within five years after the decision in *Bayview I,* meaning by November 9, 2006. *Id.* The injunction also requires MTC to amend its Regional Transportation Plan to include a section specifying how it will achieve full implementation of TCM 2. After slightly modifying the injunction, the District Court entered final judgment. MTC appeals the injunction and final judgment.

## II. DISCUSSION

### A. The Plain Language of TCM 2

 We start with the plain language of TCM 2. "A regulation should be construed to give effect to the natural and plain meaning of its words." *Crown Pacific v. Occupational Safety & Health Review Comm'n,* 197 F.3d 1036, 1038 (9th Cir. 1999) (citation and quotation marks omitted). No provision within TCM 2 actually stated that MTC was required to increase ridership by any specific amount. TCM 2 required MTC to undertake the four-step implementation strategies, including "[s]upport post–1983 improvements identified in [the] transit operator's 5–year plans" and "adopt [a] ridership increase target for 1983–1987." The expected ridership increase was never described as anything more than a "target," however. The District Court itself acknowledged as much, twice, observing that: "TCM 2 does not, on its face, require a ridership increase of 15%," and that "nothing in the language of TCM 2 explicitly requires that the increase be achieved." *Bayview I,* 177 F.Supp.2d at 1026 & 1027.

 Agreeing to establish a ridership "target" is simply not the same as promising to attain that target. A fundamental principle of contract formation is that a "promise must be distinguished from a statement of opinion or a mere prediction of future events." RESTATEMENT (SECOND) OF CONTRACTS § 2 cmt. (f) (1981). Similarly, " 'predictions as to future events are ordinarily non-actionable expressions of opinion' " under basic principles of the tort of fraudulent misrepresentation. *In re Jogert, Inc.,* 950 F.2d 1498, 1507 (9th Cir.1991) (quoting *Richard P. v. Vista Del Mar Child Care Serv.,* 106 Cal.App.3d 860, 165 Cal.Rptr. 370, 373 (1980)).

 That by its plain language TCM 2 does not establish a mandatory requirement to increase transit ridership by a specified percentage weighs heavily against the conclusion that such an obligation can be imposed based upon TCM 2. As laudatory as the goal of reducing the ozone level is, an obligation cannot be imposed based upon a SIP if that obligation was not actually undertaken in the SIP.

The underlying problem appears to be that the hoped-for increases in productivity did not result in the projected increase in ridership. Significantly, the District Court did not find that MTC failed to take the actions specified in TCM 2 that were more reasonably within its control—and more explicitly spelled out as commitments in TCM 2—such as to "[s]upport post–1983 improvements identified in transit opera-

tor's 5-year plans." Moreover, the District Court expressed sympathy for Defendants' argument that "outside forces—for example, changing work patterns or individual preferences in choosing to ride or not to ride public transit—might prevent the region from achieving a 15% or, indeed, any other increase in transit ridership." *Bayview I*, 177 F.Supp.2d at 1027–28. The District Court concluded, however, that this argument was "irrelevant." *Id.* at 1028.[2] We disagree.

It would have been apparent at the time that TCM 2 was adopted that it might not be possible to achieve a 15% increase purely through productivity increases. "Predicting human behavior ... is an inexact science at best." *Honig v. Doe*, 484 U.S. 305, 321, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988). Indeed, that is probably why TCM 2 contained the word "target." Unable to be certain that implementation of the specific steps spelled out in TCM 2 would result in a specified level of ridership, the drafters of TCM 2 were careful enough not to characterize any given increase in ridership as an obligation. Interpreting TCM 2

otherwise would imply the implausible proposition that MTC drafted and proposed[3] a TCM even though its compliance would be contingent upon a number of uncontrollable external factors. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) ("It is true that interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."); *Cf.* BLACK'S LAW DICTIONARY 912 (6th ed. 1990) ("Lex non cogit ad impossibilia: The law does not compel the doing of impossibilities.").

There was logic behind the language that was used in TCM 2. In the face of that language and logic, the conclusion that TCM 2 established a binding obligation on the part of MTC to achieve a specific increase in public transit ridership cannot be sustained.

**B. Other Portions of TCM 2**

██ The injunction sought by Bayview and entered by the District Court does not

**2.** The District Court noted that "where a SIP is violated, liability attaches, regardless of the reasons for the violation." *Bayview I*, 177 F.Supp.2d at 1028 (citations and quotation marks omitted). The District Court justified its reasoning by noting that "Defendants could have taken the potential effect of individual preferences into account when setting the ridership increase target to be achieved." *Id.* at 1029. This analysis incorrectly presumes that TCM 2 imposes a 15% ridership increase obligation.

**3.** As this court has emphasized, "[b]y virtue of the States' roles in devising a strategy and adopting an implementation plan, ... '[i]t is to the States that the [CAA] assigns initial and primary responsibility for deciding what emissions reductions will be required from which sources.' " *Hall v. U.S. EPA*, 273 F.3d 1146, 1153 (9th Cir.2001) (quoting *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 470–72, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001)). The

District Court references past statements that MTC has made as evidence that MTC is being disingenuous in its present interpretation of TCM 2. The District Court cites the 1990–94 Transportation Improvement Program Air Quality Conformity Assessment, which states that TCM 2's "goal was to increase transit ridership by 15% between 1982/1983" and describes "further steps" that MTC could take "to fully implement" TCM 2. These statements, however, are equally consistent with the view that the ridership increase is merely an unenforceable, aspirational objective of TCM 2. Though Bayview argues that the phrase "to fully implement" indicates that MTC itself believed it was in noncompliance with TCM 2, MTC in its last RFP report for TCM 2 in 1987 stated that TCM 2 "has completed its final year of implementation." MTC's past statements regarding TCM 2 seem more a result of imprecise vocabulary than disingenuousness.

state *how* MTC is to increase ridership. It simply requires MTC to: "(1) amend the [Regional Transportation Plan] to include a section addressing specifically how MTC will achieve the target increase and (2) provide the Court with regular reports describing its efforts towards achieving compliance, including interim ridership statistics." *Bayview II*, 212 F.Supp.2d at 1169.

TCM 2 was not silent on that subject, though. It explicitly stated that the ridership increase would be achieved by improvements in productivity without costing much more money. TCM 2's "COST" section identified the "costs" of TCM 2 essentially as the "[c]osts of maintaining the existing level of services." It went on to explain that "[r]idership increases would come from productivity improvements, thus additional costs would be moderate." The "DESCRIPTION OF CONTROL MEASURE" section of TCM 2 explicitly stated that "[s]ince federal funds for transit purposes are being cut back, many of the improvements identified in the[transit operators'] 5 year plans deal with increased productivity. Thus, while the size of the transit system may not grow significantly, the ridership is expected to increase." Presumably, that meant that substantial additional funds, notably for capital investments to expand the transit system, would not be required in order to reach the 15% target.

 If TCM 2 is read to impose an obligation binding on MTC to achieve a ridership increase, then those other parts of TCM 2 must be read to be part of that obligation, too. A "basic rule of statutory construction is that one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." *Hughes Air Corp. v. Public Utilities Comm'n,* 644 F.2d 1334, 1338 (9th Cir.1981); *see also United States v. Bonilla–Montenegro,* 331 F.3d 1047, 1051 (9th Cir.2003) (citing *Ratzlaf v. United States,* 510 U.S. 135, 140–41, 114 S.Ct. 655, 126 L.Ed.2d 615(1994)) (noting that this court "avoid[s] a statutory construction that would render another part of the same statute superfluous."). This principle is also fundamental in contract interpretation. *See, e.g., Ins. Co. of State of Pennsylvania v. Associated Intern. Ins. Co.,* 922 F.2d 516, 522 (9th Cir.1990) (noting the principle under California law that " '[t]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.' " (quoting CAL. CIV. CODE § 1641(West 1985))).

Assuming for discussion that it required MTC to achieve a 15% increase in ridership, TCM 2, read in full, also required that MTC attain the increase through productivity increases not requiring the expenditure of substantially more funds. But that is not what the injunction says. Nor, it turns out, is it how MTC is expected to satisfy the injunction. MTC's later submission to the District Court regarding its compliance with the July 2002 injunctive order demonstrates that its current efforts to increase transit ridership depend not on productivity improvements, but rather on system expansions, such as increasing the "size of the transit fleet, growth in revenue hours of service, and growth in the size of transit operating budgets." MTC's Submission of Regional Transportation Plan Amendment in Compliance with July 19, 2002 Order, Attach. E. at 193 (filed January 16, 2003). MTC has specifically identified a number of new transit projects intended to increase ridership, including the purchase of new buses, extension of the Bay Area Rapid Transit subway system with new lines and stations, and, over the long term, the imple-

mentation of a "major new transit expansion program" for the Bay Area. *See id.* at 201–07. MTC submits that its 2001 Regional Transportation Plan, which allocates 24% of total transit expenditures to transit expansion, "provides the foundation for achieving the court-mandated 15 percent ridership increase." *Id.* at 209–10. That program is not what was provided for in TCM 2. A requirement that MTC attain a 15% increase in ridership, no matter how and without regard to the cost, can be inferred from TCM 2 only by disregarding parts of TCM 2 itself. That measure was not a blank check on MTC's account and cannot properly be read that way.

## C. *Enforceable SIP Strategies and Unenforceable SIP Goals*

 In giving effect to TCM 2's provisions outlining its productivity improvements strategy, we recognize the well-established rule that courts may only enforce specific SIP strategies, and may not enforce a SIP's overall objectives or aspirational goals. *See, e.g., Trustees for Alaska v. Fink,* 17 F.3d 1209, 1212 (9th Cir.1994) (noting that TCMs in a SIP must be "submitted to the EPA in an enforceable form" and that a SIP is "not enforceable apart from specific TCM strategies") (citations omitted); *Action for Rational Transit v. West Side Highway,* 699 F.2d 614, 616 (2nd Cir.1983) ("aims and goals of the SIP are not enforceable apart from the specific measures designed to achieve them"). TCM 2 clearly designated implementation of the productivity improvements outlined in the transit operators' five year plans as a specific SIP strategy to increase ridership, where ridership increases serve as a proxy for emissions reductions.[4] Accordingly, the 15% target was an unenforceable

estimate or goal that was directly correlative to the general objectives that inhere in attainment of the NAAQS.

This is further supported by reading TCM 2 against the backdrop of TCM 1, which "reaffirms" a measure from the 1979 Air Quality Plan that was intended to improve transit service and increase ridership. *See Campesinos Unidos v. U.S. Dep't of Labor,* 803 F.2d 1063, 1069 (9th Cir.1986) ("[O]ur task is to interpret the regulation as a whole, in light of the overall statutory and regulatory scheme, and not to give force to one phrase in isolation."). TCM 2 stated that it was "basically an extension of TCM 1." According to the text of TCM 1, the provision "reaffirms the commitment to the 1979 strategy," which sought to "improve transit service based upon the transit operators' five year plans." "This *strategy*" was expected to "increase transit ridership by 28% between 1978 and 1983." (emphasis added)

While the District Court found that TCM 1's reaffirmation of the "1979 strategy" implied an enforceable, general SIP strategy of increasing ridership, the entire text of TCM 1 actually supports the view that ridership increase targets are unenforceable SIP goals. TCM 1 explicitly stated that ridership increases were to be accomplished through the enforceable *"strategy"* of "improv[ing] transit service based upon the transit operators' five-year plans." As TCM 2 was "basically an extension of TCM 1" it similarly had an enforceable strategy of improving transit services, specifically through the productivity improvements outlined in the transit operators' five-year plans.

---

4. The dissent suggests that the 15% ridership increase provision should be enforced as binding, since otherwise TCM 2 would not have been in enforceable form. We disagree.

TCM 2 contains enforceable provisions, specifically the four-step implementation strategy. If MTC failed to fulfill those provisions, it could appropriately be required to do so.

## D. The Absence of a Ridership Increase Requirement Does Not Render TCM 2 "Virtually Meaningless"

Bayview argues, and the District Court agreed, that failure to infer an increase ridership obligation "would render TCM 2 virtually meaningless." *Bayview I*, 177 F.Supp.2d at 1027. If the target is perceived as only a voluntary objective, MTC could perpetually engage in "wishful thinking" regarding emissions reductions.

■ That disregards the larger regulatory scheme of which TCM 2 was a part. The existence of the 1982 SIP's contingency plan control measures and the availability of SIP revisions render unnecessary the inference of an enforceable ridership increase. MTC's failure to achieve a 15% increase in ridership does not imply its noncompliance with TCM 2; rather, it implies the failure of TCM 2's productivity improvement strategy to increase ridership and therefore reduce emissions. Similarly, MTC's failure to achieve the 15% target does not imply its noncompliance with the CAA. Indeed, MTC's attainment of the NAAQS through the implementation of contingency measures in the early 1990s, while it failed to obtain the 15% target, demonstrates that the target was *not* a mandated condition precedent to NAAQS attainment.[5]

It is on this point that the dissent misconstrues TCM 2's statement that "[r]idership gains are monitored through annual [Reasonable Further Progress] reports" as meaningful only if TCM 2's 15% ridership target is perceived as an enforceable strategy of the 1982 SIP. Where a state agency fails to make "Reasonable Further Progress" (RFP), which is nothing more than a measure of the progress of control measures in reducing emissions deemed necessary to attain NAAQS, it may resort to "contingency measures." The purpose of the monitoring requirement was to demonstrate the ongoing feasibility of RFP under TCM 2, *not* to ensure that MTC was in compliance with TCM 2. Given that TCM 2's expected ridership gains were intended to be correlative to its expected emissions reductions, the unexpectedly low ridership levels described in the RFP monitoring reports indicated that TCM 2 was not achieving adequate emissions reductions to make RFP. Quite sensibly, the 1982 SIP specifically provided that "[i]f a determination is made that RFP is not being met for the transportation sector, MTC will adopt additional TCMs within 6 months of the determination."

This is exactly what happened in the case at hand, as the early 1990s *CBE I, II,* and *III* litigation demonstrates. The failure to achieve the estimated emission reductions under the 1982 SIP resulted in the adoption of a number of contingency TCMs to make up the emissions reduction shortfall. The history of the 1982 SIP establishes that the 15% ridership target, a mechanism for calculating corresponding emission reduction estimates under TCM 2, was essentially an overly optimistic assessment of the effect that MTC's productivity improvements strategy was to have on ridership levels.

---

5. We grant MTC's November 4, 2003 motion for the court to take judicial notice of the EPA Proposed Rule "Approval and Promulgation of Implementation Plans and Determination of Attainment of the 1–Hour Ozone Standard for the San Francisco Bay Area, California, and Determination Regarding Applicability of Certain Clean Air Act Requirements," published in the Federal Register on October 31, 2003, at 68 Fed.Reg. 62041. Though the proposed rule will officially determine that the Bay Area has once again attained compliance with the one-hour ozone standard, the Bay Area's attainment with the 8–hour ozone standard, "which is more protective of public health and more stringent than the 1–hour standard," has not as of this date been determined. *Id.* at 62041 n. 1.

■ The relevant solution to the emissions shortfall has been, and continues to be, SIP revisions that incorporate new TCMs.[6] Bayview's citizen suit represents an inappropriate attempt to alter TCM 2's explicit provisions. Parties "may not, through a citizen suit, obtain modification of an SIP to conform with their own notion of proper environmental policy." *Wilder v. Thomas*, 854 F.2d 605, 614 (2nd Cir. 1988), *cert. denied*, 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989) (quotation marks and citations omitted). Citizen suits may only be "brought to enforce specific measures, strategies, or commitments *designed* to ensure compliance with the NAAQS." *Conservation Law Found., Inc. v. Busey*, 79 F.3d 1250, 1258 (1st Cir.1996) (emphasis added). The sole aspects of TCM 2 that were "designed" to reduce emissions and achieve NAAQS attainment were the productivity improvements of the transit operators' five-year plans, not the ridership target. The only appropriate basis for Bayview's citizen suit would thus be that MTC has failed to implement the transit operators' five-year plans. As the District Court found MTC not liable with respect to implementing the five-year plans, Bayview lacks a legal foundation in this case from which to find MTC liable in its implementation of TCM 2.

### E. The EPA Opinion Letter

■ Bayview's interpretation of TCM 2 significantly relies upon a 1998 EPA opinion letter that interpreted TCM 2 to require a 15% ridership increase obligation. *See Bayview I*, 177 F.Supp.2d at 1028 (citing letter from regional EPA air division director stating, "We believe that

TCM 2 will be fully implemented only when transit ridership increases by 15% from 1982–83 levels."). The District Court held that "as the agency responsible for interpreting SIPs, EPA's opinion, as set forth in an opinion letter, is 'entitled to respect' . . . but only to the extent that [it has] the 'power to persuade.' " *Id.* (quoting *Christensen v. Harris County*, 529 U.S. 576, 587–88, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)); *see also United States v. Mead Corp.*, 533 U.S. 218, 230, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (finding that an agency interpretation that is not accorded *Chevron* deference may still be entitled to "a respect proportional to its 'power to persuade.' ") (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)). The District Court accepted the EPA's interpretation "because the EPA is ultimately responsible for the enforcement of SIPs." *Bayview I*, 177 F.Supp.2d at 1028.

Because the plain language of TCM 2 does not require MTC to increase ridership levels by 15%, according deference to the EPA opinion letter's interpretation is unwarranted. *See, e.g., Wards Cove Packing Corp. v. Nat'l Marine Fisheries Service*, 307 F.3d 1214, 1219 (9th Cir.2002) ("[T]he plain meaning of a regulation governs and deference to an agency's interpretation of its regulation is warranted *only when* the regulation's language is ambiguous." (emphasis added)) (citing *Christensen v. Harris County*, 529 U.S. 576, 588, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000)); *cf. INS v. St. Cyr*, 533 U.S. 289, 320 n. 45, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001) ("[W]e *only* defer . . . to agency

---

**6.** MTC did suggest to the EPA that TCM 2 and other older implemented TCMs be removed from the SIP while it prepared its 1999 Ozone Attainment Plan. The EPA rejected this suggestion *not* on the grounds that MTC was in violation of any of the TCMs, but rather that

such TCMs, as implemented under the 1982 SIP, "clearly have emissions reductions in the SIP" and that MTC had failed to propose new measures "to provide the equivalent or greater emissions reductions."

interpretations of statutes that, applying the normal 'tools of statutory construction,' are ambiguous." (emphasis added)) (quoting *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

## III. CONCLUSION

The language and logic of TCM 2 lead us to conclude that TCM 2 does not impose an enforceable obligation on MTC to increase ridership on public transit by 15% over 1982–83 levels. Increasing the use of public transportation would probably reduce emissions and assist the Bay Area to attain the NAAQS standards. If more needs to be done in order to attain those standards, it might be appropriate to include further specific steps aimed at increasing public transit ridership within a revised SIP or within new contingent TCMs. But the existing SIP cannot properly be read to require more than the four specific steps, described as the "implementation schedule," which MTC actually committed to undertake. MTC has not been held to have fallen short with regard to those steps, so the judgment of the District Court, including the injunction, must be reversed.

**REVERSED.**

THOMAS, Circuit Judge, dissenting:

I respectfully disagree with my colleagues that TCM 2 does not impose an enforceable obligation on MTC. Regardless of whether the "plain language" of TCM 2 suggests that the 15% ridership increase is best construed as an "obligation" or a "commitment" or a "target" or a "requirement," it is undeniable that the Clean Air Act requires that state implementation plans be submitted to EPA in an "enforceable form." *See* Clean Air Act ("CAA"), 42 U.S.C. § 7502(c); *Trustees for Alaska v. Fink,* 17 F.3d 1209, 1212 (9th Cir.1994). When the EPA approved TCM 2 as a component of California's SIP in 1984, the measure became a federally enforceable regulation, and it remains so as long as it is included in the SIP. If the 15% ridership increase provision in TCM 2 were not binding, then the measure would not truly have been in enforceable form, and it would thus have been in violation of the Clean Air Act.

The majority suggests that the 15% ridership increase figure is a mere aspiration, or that it is similar to a "statement of opinion," or a "prediction as to future events." The majority also acknowledges, however, that TCMs must be submitted in enforceable form, and that "aims and goals of the SIP are not enforceable apart from specific TCM strategies." *Id.* The majority thus holds that what meets the requirement of "enforceable form" in TCM 2 are the steps contained in TCM 2's "Implementation Schedule" and the "productivity improvements" mentioned in TCM 2's "Control Measure" section.

If only the Implementation Schedule and the Control Measure section of TCM 2 were enforceable, however, then all that MTC could be required to do under TCM 2 is *"consult"* with operators, *"seek"* to ensure" implementation of transit operators' 5–year plans through the Transportation Improvements Plan, and *"monitor"* ridership gains through RFP reports. *See* TCM 2 (emphasis added). It is difficult to imagine that a transportation commission could ever be said to have failed to achieve such vague "requirements," such that that commission could actually be compelled to meet those "standards" by way of an enforcement action by the EPA. This brand of "enforceability" is too attenuated and amorphous to serve the ultimate attainment of federal air quality standards, as envisioned by the statute. *See* 42 U.S.C. § 7502(c).

The majority also fails to explain how the "plain language" of the statement

"[s]ince federal funds for transit purposes are being cut back, many of the improvements identified in the 5–year plans deal with increased productivity" is clearly different from a "statement of opinion" or a simple description, or why a description of regional plans as "dealing with increased productivity" should be interpreted as a requirement that certain of these "many" improvements be enforced.

The EPA is the agency responsible for interpreting SIPs; the Agency clearly found that TCM 2, as well as the other TCMs implemented under the 1982 SIP, contained quantifiable emissions reductions, saying the TCMs "clearly have emissions reduction in the SIP," and that any new measures proposed by MTC would need "to provide the equivalent or greater emissions reductions." The regional EPA air division director stated further in an opinion letter that "[w]e believe that TCM 2 will be fully implemented only when transit ridership increases by 15% from 1982–83 levels." This opinion, taken in the context of the requirement that SIPs be submitted in enforceable form, is persuasive. *See Christensen v. Harris County,* 529 U.S. 576, 587–88, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

The fact that MTC submitted what it now considers an unrealistic TCM to the EPA, for whatever reason, should not affect the regular, predictable application of the Clean Air Act's enforcement mechanisms. As the district court said, "[w]ithout this judicial check, state and local governments could use a conditional commitment as a gimmick to delay indefinitely hard political choices...." *Bayview, et al. v. MTC,* 177 F.Supp.2d 1011, 1212 (N.D.Cal.2001). Without methodical enforcement, local and regional agencies could define their commitments as vaguely as possible in order to avoid constraint and reform, and then later redefine stric-

tures away if faced with unpopular trade-offs. If MTC finds that it cannot meet the 15% requirement, it may plead its case to the EPA, and it may take advantage of the CAA's "exclusive modification mechanisms." *See* 42 U.S.C. §§ 7410(n)(1), 7410(*l*); *General Motors Corp. v. United States,* 496 U.S. 530, 533, 110 S.Ct. 2528, 110 L.Ed.2d 480 (1990). MTC can propose a new measure to the EPA that ensures at least the same level of emission reductions of ozone precursors in the SIP as TCM 2. *See* 42 U.S.C. § 7515. MTC has had this option available to it for years, but it has submitted no alternate proposals. Hence, TCM 2 remains in the SIP, and is enforceable until substituted.

In sum, the regular statutory procedures for altering SIPs are not only the most effective manner in which to proceed, but the one mandated by Congress. In my view, the district court was entirely correct in concluding that MTC cannot unilaterally alter its obligations under TCM 2 outside of the mechanism provided by statute.

Thus, I would affirm the district court's well-reasoned order in its entirety.